UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **U.S. Pastor Council**, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>**Equal Employment Opportunity Commission**, et al.,<br><br>    Defendants. | Case No. 4:18-cv-00824-O |

## BRIEF IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS

Charles W. Fillmore
H. Dustin Fillmore
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and the Proposed Classes*

# TABLE OF CONTENTS

Table of contents ...................................................................................................i

Table of authorities ...............................................................................................ii

I.  The plaintiffs have alleged Article III standing to seek relief against the EEOC ........ 1

A.  Braidwood and the U.S. Pastor Council have Article III standing because they are violating the EEOC's announced interpretation of Title VII and exposing themselves to the risk of EEOC lawsuits ............................................1

1.  The threats conveyed in the EEOC's brochure—and the threats conveyed by the EEOC's lawsuit against Harris Funeral Homes— inflict injury in fact on the plaintiffs............................................2

2.  The injuries caused by the EEOC's threats are fairly traceable to the EEOC and are likely to be redressed by a favorable decision from this court ...............................................................................9

B.  Even apart from the threat of EEOC enforcement, the plaintiffs have Article III standing because the EEOC's brochure forces them to choose between competing religious duties...........................................12

C.  Braidwood has Article III standing to sue the EEOC because its third-party benefits administrator redefined "marriage" in its self-insured health plan to include same-sex couples ...........................................13

D.  Braidwood has Article III standing to sue the EEOC because it is unwilling to post the agency's required signage until the EEOC or the courts repudiate its interpretation of Title VII ...........................................14

II. The plaintiffs have alleged Article III standing to seek relief against the Attorney General..............................................................................15

III.The plaintiffs' claims are ripe ...........................................................16

Conclusion ...........................................................................................17

Certificate of service ...........................................................................18

# TABLE OF AUTHORITIES

**Cases**

*American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987).....................15

*Bowsher v. Synar*, 478 U.S. 714 (1986) ........................................................................1, 8

*Christensen v. Harris County*, 529 U.S. 576 (2000)...........................................................11

*Doe v. Bolton*, 410 U.S. 179 (1973) ........................................................................passim

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ......................................................................6

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) .........................................2, 11

*EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*,
   884 F.3d 560 (6th Cir. 2018)...........................................................................1, 3, 7

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station
   Employees*, 466 U.S. 435 (1984)...........................................................................14

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .......................................................................4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................................1

*National Conference of Catholic Bishops v. Smith*,
   653 F.2d 535 (D.C. Cir. 1981) ...............................................................................8

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ................................................................13

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...............................................................11

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................2, 3, 4

*Stenberg v. Carhart*, 530 U.S. 914 (2000).........................................................4, 7, 15, 16

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...............................................6, 9

*Texas v. United States*, 300 F. Supp. 3d 810 (N.D. Tex. 2018).........................................3

*Texas v. United States*, 352 F. Supp. 3d 665 (N.D. Tex. 2018)......................................12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .........................................................11

*Valley Forge Christian College v. Americans United for Separation of Church
   and State, Inc.*, 454 U.S. 464 (1982) ...................................................................15

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ...................................5

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013).......................................5

**Other Authorities**

Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991 (1997)....................3

The EEOC has declared that Title VII compels employers to recognize same-sex marriage and allow their employees into restrooms that correspond to the gender identity that they assert. The EEOC is fully enforcing this interpretation of Title VII—and it is suing Christian employers that follow the teachings of their faith rather than the EEOC's edicts. *See EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018) (cert. granted April 22, 2019). The plaintiffs have every right to seek declaratory relief to ensure that their religious convictions are protected by federal law. They are not required to await an EEOC enforcement action before asserting their rights, and they are not required to endure the *in terrorem* effects of the EEOC's "regulatory guidance," which is threatening and intimidating religious employers throughout the United States.

## I.   THE PLAINTIFFS HAVE ALLEGED ARTICLE III STANDING TO SEEK RELIEF AGAINST THE EEOC

To establish Article III standing at this stage of the litigation, a plaintiff needs only to allege: (1) an injury in fact, which is (2) fairly traceable to the challenged conduct of the defendants, and is (3) likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Only one of the plaintiffs needs Article III standing to seek the requested relief; if a single plaintiff can establish Article III standing, then the second plaintiff may seek the same relief, regardless of whether he would have standing in his own right. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

The first amended complaint provides no fewer than four theories of Article III standing. *See* First Amended Complaint (ECF No. 19) at ¶ 77–80, 83 (U.S. Pastor Council); *id.* at 84–87 (Braidwood). The government must refute *all* of these theories to prevail on its motion to dismiss.

### A.   Braidwood And The U.S. Pastor Council Have Article III Standing Because They Are Violating The EEOC's Announced Interpretation Of Title VII And Exposing Themselves To The Risk Of EEOC Lawsuits

Braidwood and the U.S. Pastor Council are refusing to comply with the EEOC's interpretation of Title VII. Braidwood is unwilling to recognize same-sex marriages or allow its

employees to use restrooms reserved for the opposite biological sex. *See* First Amended Complaint (ECF No. 19) at ¶ 34, 36. The member churches of the U.S. Pastor Council categorically refuse to consider practicing homosexuals or transgender individuals for church employment. *See id.* at ¶ 77. The EEOC, however, is threatening these employers—and religious employers throughout the United States—with lawsuits for operating their workplaces in accordance with their Christian faith. The Declaratory Judgment Act and the rules of Article III have long permitted pre-enforcement challenges in these situations. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (allowing abortion providers to challenge a state abortion statute "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes.").

1. **The Threats Conveyed In The EEOC's Brochure—And The Threats Conveyed By The EEOC's Lawsuit Against Harris Funeral Homes—Inflict Injury In Fact On The Plaintiffs**

The government denies that the EEOC brochure can inflict injury in fact because the EEOC lacks the authority to issue substantive rules. *See* ECF No. 29 at 13 (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 257 (1991)). The EEOC does, however, have the power to enforce Title VII by bringing lawsuits against employers that violate the EEOC's interpretation of the statute, and its brochure serves as an announcement of how the EEOC will exercise those enforcement powers. Agency "guidance documents" of this sort may not qualify as substantive rules within the meaning of the APA, but they serve as warnings and threats to anyone who would depart from the agency's announced interpretation of the statute. These announcements are "rules" within the meaning of the APA—even though they are not *substantive* rules that must go through notice and comment—and they qualify as final agency action that is subject to challenge under 5 U.S.C. § 704. *See Texas v.*

*United States*, 300 F. Supp. 3d 810, 838 (N.D. Tex. 2018) ("[A]n agency guidance document that reflects a 'settled agency position' that the entire agency intends to follow in its enforcement of its regulations, and that gives 'marching orders' to a regulated entity, is 'final' agency action against the regulated entity — even if the document contains boilerplate denying its legal effect."). The brochure may not have the same "legal effect" as notice-and-comment rulemaking, but it most assuredly has "legal effect" from the standpoint of religious employers who are being forced to choose between subjecting themselves to the risk of an EEOC lawsuit or abandoning the teachings of their faith. *See* Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991, 992 (1997) ("[A] legal duty so called is nothing but a prediction that if a man does or omits certain things he will be made to suffer in this or that way"). The plaintiffs' "injury" is the *threat* of an EEOC enforcement lawsuit that is communicated by the brochure, and the government does not (and cannot) deny that the EEOC brochure communicates this threat.

More importantly, the plaintiffs are not seeking relief solely against the EEOC brochure. They are asking this Court to permanently enjoin the EEOC from enforcing its interpretation of Title VII against any employer with sincere religious objections to homosexual or transgender behavior — regardless of whether the EEOC's enforcement policies are memorialized in a brochure or "guidance document." The EEOC has already sued a Christian funeral home for refusing to allow a biologically female employee to dress like a man. *See EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018) (cert. granted April 22, 2019). And it is these *actions* — in addition to the brochure — that are threatening religious employers throughout the country and imposing injury in fact on the plaintiffs.

The government suggests that the plaintiffs cannot challenge the EEOC's interpretation of Title VII unless they have been "subject[ed] to . . . enforcement action pursuant to the EEOC brochure." ECF No. 29 at 13. That is flatly incompatible with the Supreme Court's rulings allowing pre-enforcement challenges. *See, e.g.*, *Steffel*, 415 U.S. at 459; *Doe*, 410 U.S.

at 188. Indeed, entire point of a pre-enforcement challenge—as well as the Declaratory Judgment Act—is to allow the courts to rule on the legality of a plaintiff's conduct *before* an enforcement action is brought. *See Steffel*, 415 U.S. at 459 ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

The government also contends that the plaintiffs cannot establish Article III standing unless one of their employees is demanding recognition of a same-sex marriage or demanding access to restrooms reserved for the opposite biological sex. *See* ECF No. 29 at 13. That stance is incompatible with *Gonzales v. Carhart*, 550 U.S. 124 (2007), and *Stenberg v. Carhart*, 530 U.S. 914 (2000), which allowed abortion providers to challenge the absence of a health exception in statutes banning partial-birth abortion—without requiring them to wait for an actual patient to show up who needed a partial-birth abortion for health reasons.[1] The abortion providers had Article III standing to challenge the absence of a health exception because it threatened them with criminal sanctions for performing partial-birth abortions that they deemed necessary for their patients' health, and it was enough for the providers to allege that they would want to perform a partial-birth abortion if and when a future patient needed that procedure for health reasons. The plaintiffs' situation is indistinguishable: The EEOC's regulatory guidance threatens them with civil-enforcement lawsuits for operating their places of employment in accordance with their Christian beliefs, and it imposes a present-day threat because the employers do not know when a future employee or job applicant (or the EEOC for that matter) might decide to challenge their policies regarding homosexual or transgender behavior. They are not required to wait for an actual dispute to arise with an employee before challenging the threats in the EEOC's brochure.

---

1.  *Gonzales* eventually rejected the abortion providers' challenge to the federal partial-birth abortion statute on the merits, but it did not deny them Article III standing to challenge the absence of a health exception, even though they had brought their pre-enforcement challenge before the emergence of any actual patient who needed a partial-birth abortion for health reasons.

The government's argument would also make it difficult (if not impossible) for an employer to *ever* obtain pre-enforcement relief against the EEOC's interpretation of Title VII. If the plaintiffs must wait for a disaffected employee or job applicant to emerge before they can seek a judicial resolution of their RFRA claims, then they will begin litigating their pre-enforcement actions at the same time that the disappointed individual will be seeking relief from the EEOC. It seems unlikely that the plaintiffs will be able to secure a judicial pronouncement that prevents the EEOC from taking enforcement action *before* the EEOC would initiate enforcement measures in response to the employee's complaints. Litigation can take years to unfold, and the employer will be left unprotected until a court issues a final judgment that declares the EEOC's interpretation unlawful. Of course, an employer can always ask for a preliminary injunction at the outset of a pre-enforcement challenge, but the standard for obtaining a preliminary injunction is demanding, especially in the Fifth Circuit. *See Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) ("This court has repeatedly cautioned that "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'" (citation omitted)).

At the very least, the government's stance presents a risk that the plaintiffs will be unable to assert their RFRA claims in a pre-enforcement challenge, and that they will be relegated to asserting those claims defensively after the EEOC has sued them in response to an employee's complaints. That is reason enough to reject the government's argument. An employer who asserts a RFRA defense in response to an EEOC lawsuit must bear his own litigation expenses, as fee shifting is available only when RFRA is asserted by plaintiffs in an "action or proceeding to enforce" the statute. 42 U.S.C. § 1988. The prospect of having to bear these litigation costs—even if the employer ultimately prevails on its RFRA defense—can chill the exercise of these federally protected rights, which is precisely why the Supreme Court allows litigants to bring pre-enforcement challenges. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Dombrowski v. Pfister,* 380 U.S. 479, 486

(1965). The plaintiffs are suffering "injury in fact" from the prospect that they will have to bear those litigation costs if they continue to act in accordance with their Christian beliefs, and only a pre-enforcement challenge such as this can remedy that Article III injury.

Finally, the government contends that the plaintiffs have failed to allege a "credible threat of prosecution." ECF No. 29 at 15 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)). But the government is flatly wrong to contend that the plaintiffs must allege a "credible threat of prosecution" directed at them personally. *See* ECF No. 29 at 15 ("Plaintiffs have not alleged any direct threat of enforcement by the EEOC against the Pastor Council's members or Braidwood."). In *Doe v. Bolton*, 410 U.S. 179 (1973), for example, the Court allowed doctors to bring a pre-enforcement challenge to Georgia's abortion law, "despite the fact that the record does not disclose that any one of them has been prosecuted, *or threatened with prosecution*, for violation of the State's abortion statutes." *Id*. at 188 (emphasis added). The Court explained:

> In holding that the physicians, while theoretically possessed of standing, did not present a justiciable controversy, the District Court seems to have relied primarily on *Poe v. Ullman*, 367 U.S. 497 (1961). There, a sharply divided Court dismissed an appeal from a state court on the ground that it presented no real controversy justifying the adjudication of a constitutional issue. But the challenged Connecticut statute, deemed to prohibit the giving of medical advice on the use of contraceptives, had been enacted in 1879, and, apparently with a single exception, no one had ever been prosecuted under it. Georgia's statute, in contrast, is recent and not moribund. Furthermore, it is the successor to another Georgia abortion statute under which, we are told, physicians were prosecuted. The present case, therefore, is closer to *Epperson v. Arkansas*, 393 U.S. 97 (1968), where the Court recognized the right of a school teacher, though not yet charged criminally, to challenge her State's anti-evolution statute. *See also Griswold v. Connecticut*, 381 U.S., at 481, 85 S. Ct. 1678.

*Id*. at 188–89. It was enough for the doctors to show that the Georgia abortion statute was "recent and not moribund," and that it was the successor to another Georgia abortion statute under which *some* physicians were prosecuted. They did not need to allege or prove a "credible threat of prosecution" directed at them specifically. They needed only to establish a

credible threat that the statute would be enforced against physicians generally, and that it was not a defunct or antiquated statute that was no longer being enforced against anyone.

And in *Stenberg v. Carhart*, 530 U.S. 914 (2000), the Court permitted abortion providers to challenge Nebraska's partial-birth abortion statute on the ground that it would prohibit the dilation and evacuation (D&E) procedure—despite the fact that the Attorney General of Nebraska had specifically disclaimed an intent to enforce the statute against any doctor who performed D&E abortions. *See id*. at 938–46. The Court allowed the doctors to raise this pre-enforcement challenge because "some present prosecutors and future Attorneys General *may choose to pursue* physicians who use D & E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment." *Id*. at 945 (emphasis). The Court found that this mere *possibility* of future prosecution—even though it had been specifically disclaimed by the current Attorney General—not only imposed an Article III injury on abortion providers, but also violated the Constitution by imposing an "undue burden" on women seeking abortions. *See id*. at 945–46.

The plaintiffs have alleged that the EEOC is enforcing its interpretation of Title VII against other religious employers. *See* First Amended Complaint (ECF No. 19) at ¶ 16 (citing *EEOC v. R.G. & G.R. Harris Funeral Homes Inc*., 884 F.3d 560 (6th Cir. 2018)). That is more than enough to establish a "credible threat of prosecution" and to confer standing for a pre-enforcement challenge. *Doe* and *Stenberg* make clear that a litigant who brings a pre-enforcement challenge is not required to allege a threat of enforcement directed at him specifically. He needs only to allege that the defendants are enforcing the challenged statute or policy against others who are similarly situated, *see Doe*, 410 U.S. at 188–89, or that the challenged statute or policy *could* be enforced by future government officials against the conduct that he is engaged in, *see Stenberg*, 530 U.S. at 945–46. The government tries to get around *Doe* by denying that the for-profit employer in *Harris Funeral Homes* is similarly situated to the church employers who belong to the U.S. Pastor Council. *See* ECF No. 29 at

16. But there is nothing in the EEOC's brochure that purports to differentiate church employers from for-profit employers; the brochure refuses to acknowledge *any* religious exemptions for *anyone*—even for churches. *See* First Amended Complaint, Exhibit 1 (ECF No. 19-1); *see also* https:// bit.ly/2MnDzG5 (last visited on March 29, 2019). That means that the EEOC (or a future EEOC) "may choose to pursue" church employers that disregard the "guidance" in the brochure—and that is all that is needed to give the U.S. Pastor Council standing to seek pre-enforcement relief. *Stenberg*, 530 U.S. at 945. In all events, the government's efforts to distinguish church employers from for-profit employers does nothing to defeat Braidwood's standing, and only one plaintiff with Article III standing is needed to obtain the relief that the plaintiffs are seeking against the EEOC. *See Bowsher*, 478 U.S. at 721.

The government relies on *National Conference of Catholic Bishops v. Smith*, 653 F.2d 535 (D.C. Cir. 1981), but the Court in that case denied justiciability for numerous reasons that are not present here. Among them: (1) The plaintiffs in *Catholic Bishops* had failed to provide sufficient facts to allow the Court to evaluate how the requirements of the Pregnancy Discrimination Act affected them;[2] (2) The plaintiffs had failed to clearly explain the nature of their religious objections to the EEOC guidelines;[3] and (3) The EEOC's own position on the meaning of the Pregnancy Discrimination Act had been inconsistent.[4] It was the combination of these and other factors that led the Court to dismiss the case for lack of an Article

---

2.  *See Nat'l Conf. of Catholic Bishops v. Smith*, 653 F.2d 535, 540 (D.C. Cir. 1981) ("Plaintiffs have not alleged what kind of sick leave, disability, or health insurance programs they provide. We lack sufficient facts to analyze how the PDA actually impacts on the plaintiffs although they allege that it does.").

3.  *See id*. at 540 ("[P]laintiffs' position is unclear. . . . They therefore imply that some abortions may be morally permissible when a mother's life is endangered. On the other hand, their exhibits on Catholic doctrine concerning abortion appear to indicate that no abortion is justified by the fact that the mother's life is "endangered" if the fetus is carried to term. Thus again, it is a matter for conjecture whether or how or under what precise circumstances plaintiffs might be in noncompliance with the PDA.").

4.  *See id*. at 541 ("Both plaintiffs and the amici point out inconsistencies between the EEOC guidelines and the government's interpretation of the PDA in its memoranda,

III case or controversy, and nothing in *Catholic Bishops* purports to establish a rule that forbids pre-enforcement challenges in a case such as this one. If the government thinks that *Catholic Bishops* should be read as allowing pre-enforcement challenges only in the face of "imminent enforcement action" directed at the plaintiffs,[5] then its holding is directly contrary to *Doe* and *Stenberg*—as well as other Supreme Court rulings that allow pre-enforcement challenges without requiring such a showing. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

### 2. The Injuries Caused By The EEOC's Threats Are Fairly Traceable To The EEOC And Are Likely To Be Redressed By A Favorable Decision From This Court

The government denies that the injuries caused by the EEOC's threats are "fairly traceable" to the EEOC's brochure. *See* ECF No. 29 at 18. But an Article III injury needs only to be traceable *to the defendant*; the plaintiffs do not need to allege or show that the *brochure* is causing their Article III injury. And the injuries that the plaintiffs allege are assuredly traceable to the EEOC and the conduct of its commissioners.

The plaintiffs are suffering Article III injury because the EEOC is threatening employers with lawsuits unless they: (1) recognize same-sex marriage; (2) allow their employees into restrooms that correspond with their asserted gender identify; and (3) tolerate and accept employees and job applicants that engage in homosexual or transgender behavior. The EEOC is communicating these threats by: (1) issuing a "guidance document" (the brochure) that describes how the EEOC intends to enforce Title VII; and (2) filing a lawsuit against a

---

which the EEOC as co-counsel endorsed. The EEOC position on the meaning of the PDA is in a state of confusion . . .").

5.   *See* ECF No. 29 at 17.

Christian funeral home, in disregard of its sincere religious objections to transgender behavior. These threats are inflicting Article III injury on the plaintiffs (and other religious employers throughout the United States) by subjecting them to the risk of EEOC enforcement actions for acting in accordance with the teachings of their Christian faith.

These Article III injuries are undeniably traceable to the EEOC. And they will be redressed by: (1) an injunction that prohibits the EEOC from enforcing its interpretation of Title VII against employers with sincere religious objections to homosexual or transgender behavior; (2) a declaratory judgment that recognizes the right of religious employers to establish employment practices that comport with their beliefs concerning homosexuality and transgenderism; and (3) a ruling that "sets aside" (formally revokes) the EEOC's "guidance document" under section 706 of the APA. If the Court issues a ruling of this sort, then the EEOC will be unable to impose the edicts in its brochure against religious employers, and those religious employers can safely operate without fear of potential litigation from the EEOC.

How can the government possibly deny that these asserted Article III injuries are traceable to the EEOC? The government argues that the EEOC brochure is "not binding" and will not receive deference from the judiciary—and that the courts rather than EEOC will ultimately decide whether Title VII's prohibition on "sex" discrimination includes discrimination on account of sexual orientation and gender identify. *See* ECF No. 29 at 18–19. Even if that is true, it does not change the fact that the EEOC remains empowered to bring enforcement actions against the plaintiffs (and other religious employers) unless and until the Supreme Court rejects the EEOC's interpretation of Title VII. And the mere threat that the EEOC might bring such enforcement actions is what is inflicting the "injury in fact"—regardless of whether the EEOC ultimately prevails in its interpretation of Title VII.

It is also far from clear that the EEOC's guidance document would receive *no* deference from the federal judiciary. *See* ECF No. 29 at 19. The Supreme Court has held that an

agency's "interpretive" rules—rules that are not "substantive" and do not go through notice and comment—are entitled to *Skidmore* deference. *See Christensen v. Harris County,* 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)"); *see also United States v. Mead Corp.,* 533 U.S. 218, 234–35 (2001). And the Court has specifically held that EEOC "guidelines" receive *Skidmore* deference, in the same manner as other agency "interpretive" rules. *See EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257 (1991) ("In *General Electric Co. v. Gilbert,* 429 U.S. 125, 140–146 (1976), we addressed the proper deference to be afforded the EEOC's guidelines. Recognizing that 'Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations,' we held that the level of deference afforded '"will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."' *Id.,* at 141, 142 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).").

But in all events, the plaintiffs' standing does not turn in any way on whether the EEOC brochure will receive *Skidmore* deference (or any level of deference) from the judiciary. The EEOC—through its brochure and through its lawsuit against Harris Funeral Homes—is threatening enforcement action against religious employers who refuse to comply with its interpretation of Title VII. Those threats are what impose injury in fact, and those threats of EEOC lawsuits remain regardless of whether the courts will extend deference to the EEOC's interpretation of the statute, and regardless of whether the courts will ultimately agree with the views expressed in the EEOC's brochure. The government may be right to assert that the EEOC brochure will make no difference in how the courts ultimately decide to interpret Title VII. But the "injury" inflicted by the brochure is not that it will alter judicial interpretations of Title VII, but that it threatens religious employers with EEOC enforcement actions if they operate their places of employment in accordance with the teachings of their faith.

B.  **Even Apart From The Threat Of EEOC Enforcement, The Plaintiffs Have Article III Standing Because The EEOC's Brochure Forces Them To Choose Between Competing Religious Duties**

The plaintiffs are suffering an additional injury that is separate and distinct from the threat of EEOC enforcement. Because the plaintiffs' Christian faith compels them to both obey the civil authorities and to refrain from endorsing or approving homosexual behavior, they are facing a situation in which they must violate at least one of their religious precepts if they wish to continue as employers. This injury remains even if the government could conclusively prove that the EEOC would never initiate an enforcement action against the plaintiffs. *Cf. Texas v. United States*, 352 F. Supp. 3d 665, 672–78 (N.D. Tex. 2018) (allowing plaintiffs to challenge the individual mandate in the Affordable Care Act, despite the fact that there was no possibility of enforcement or penalties against those who refused to comply).

The government barely addresses this argument. Instead, it asserts (incorrectly) that this is the "*only* past or present harm alleged by the Plaintiffs from the EEOC Brochure." ECF No. 29 at 14. Then it claims that the plaintiffs need not worry about their religious duty to obey the civil authorities because EEOC brochure "does not create legal requirements that must be obeyed." *Id.* at 15. The EEOC's brochure, however, reflects the *actual views* of the civil authorities that are charged with the enforcement of Title VII. Until those views have repudiated by a higher source of civil authority (such as a court), the plaintiffs have an obligation as Christians to respect and obey the civil authorities that *currently* purport to be expounding their legal obligations. And that duty is now in contradiction with their other responsibilities as Christians to uphold Biblical teaching on matters of sexuality.

Of course, the plaintiffs believe that the EEOC's interpretation of the law is mistaken, and that the Religious Freedom Restoration Act exempts religious employers from the rules that appear in the EEOC's brochure. But it is for the civil authorities to ultimately decide whether the Religious Freedom Restoration Act provides this safe harbor for religious employers, and neither the EEOC (nor any court of which we are aware) has held that the RFRA

confers such protections on the plaintiffs. The plaintiffs are therefore suffering injury in fact from this EEOC-induced dilemma, and a ruling that enjoins the EEOC from enforcing its interpretation of Title VII against religious employers will redress that Article III injury.

### C. Braidwood Has Article III Standing To Sue The EEOC Because Its Third-Party Benefits Administrator Redefined "Marriage" In Its Self-Insured Health Plan To Include Same-Sex Couples

The government does not deny that Braidwood is suffering injury in fact from the actions of its third-party benefits administrator, which unilaterally (and without Dr. Hotze's consent) changed the definition of "marriage" in Braidwood's self-insured health plan. But the government denies that this injury is "fairly traceable" to the EEOC. *See* ECF No. 29 at 21. The government is mistaken.

The *only* reason that Entrust changed the definition of "marriage" is Braidwood's plan was because it "firmly believe[s] that [the] definition . . . is in line with the clear law of the United States." First Amended Complaint, Exhibit 5 (ECF No. 19-5). But there is *no* law of the United States that compels private employers to recognize same-sex marriage. The Supreme Court's ruling in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), requires only state governments to recognize same-sex marriage. The Supreme Court has no authority to compel private employers to recognize same-sex marriage under the guise of interpreting the Fourteenth Amendment, which governs only the behavior of state actors. *See Civil Rights Cases*, 109 U.S. 3 (1883).

The only *possible* source of authority that could support Entrust's claim that federal law compels Braidwood to recognize same-sex marriage is the EEOC's brochure, which specifically asserts that Title VII prohibits an employer from "denying spousal health insurance benefits to a female employee because her legal spouse is a woman, while providing spousal health insurance to a male employee whose legal spouse is a woman." First Amended Complaint, Exhibit 1 (ECF No. 19-1). As far as we are aware, there is no other statute, regulation, court decision, or agency guidance document that purports to require Braidwood (or any

other private employer) to recognize the same-sex marriages of its employees. And the government is unable to cite any other provision of law—or even an agency guidance document—that imposes such a requirement on private employers.

Entrust is laboring under the belief that federal law compels Braidwood to recognize same-sex marriage. And the EEOC is reinforcing and propagating that belief by publicly announcing that Title VII requires private employers to recognize the same-sex marriages of their employees, and by threatening enforcement action against employers who deny this. A ruling from this Court that declares that the EEOC has no authority to compel private employers to recognize same-sex marriage, or that (at the very least) exempts religious employers from the EEOC's edicts, will redress Braidwood's injury by enabling it to refute Entrust's insistence that its changes to Braidwood's health plan were legally compelled. In the absence of a ruling that repudiates the EEOC's brochure, Entrust can persist in its belief that federal law compels private employers to recognize same-sex marriage, and Braidwood has no means of ensuring Entrust that its health plan can lawfully withhold recognition of same-sex marriage.

### D.   Braidwood Has Article III Standing To Sue The EEOC Because It Is Unwilling To Post The Agency's Required Signage Until The EEOC Or The Courts Repudiate Its Interpretation Of Title VII

Finally, Braidwood is suffering injury in fact because federal law requires it to post the EEOC's signs in its places of employment, and Braidwood is unwilling to post these signs when the EEOC is persecuting Christian businesses such as the Harris Funeral Homes. The government denies that this constitutes "injury in fact," but that argument is untenable. The EEOC is requiring Braidwood to post signs that it does not want to display; that is all that is needed to establish an "injury in fact." *See Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 466 U.S. 435, 442 (1984) (holding that an Article III case or controversy exists "as long as the parties have a concrete interest, *however small*, in the outcome of the litigation" (emphasis added)).

The government might not think that Braidwood *should* be objecting to the posting of EEOC's signs, but that does not defeat Article III standing. *See* ECF No. 29 at 14. The government is equally off base in its attempt to pass off Braidwood's injury as a mere "psychological consequence presumably produced by observation of conduct with which one disagrees." *See* ECF No. 29 at 14 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982)). Braidwood is objecting to the *physical presence* of the EEOC's signs in its places of employment; it has as much standing to challenge these signs as a pedestrian who encounters a religious display on public lands. *See, e.g.*, *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987). Braidwood may or may not succeed on the merits of its challenge to the compelled posting of these signs, but it assuredly has standing to bring such a challenge.

## II.   THE PLAINTIFFS HAVE ALLEGED ARTICLE III STANDING TO SEEK RELIEF AGAINST THE ATTORNEY GENERAL

The government argues that the plaintiffs cannot seek relief against the Attorney General because the Department of Justice has disavowed the EEOC's interpretation of Title VII. *See* ECF No. 29 at 11–12. But that argument is incompatible with *Stenberg v. Carhart*, 530 U.S. 914 (2000), which allowed abortion providers to enjoin the Nebraska Attorney General from enforcing the state's partial-birth abortion law against D&E abortions, even though the Attorney General had specifically disclaimed an intent to enforce the law against those procedures. *See id.* at 938–46. The Court recognized that "future Attorneys General *may choose to pursue* physicians who use D & E procedures," and that was sufficient to allow the plaintiffs to seek judicial relief against the present-day Attorney General. *See id.* at 945.

So too here. The Department of Justice's current interpretations of Title VII are not binding on its successors, and both Title VII and the EEOC's brochure are written in a manner that could enable future Attorneys General to "choose to pursue" religious employers who violate the EEOC's interpretation of Title VII. The government correctly notes that the Attorney General lacks the power to bring enforcement actions directly against private

employers such as the plaintiffs, but the Department of Justice must authorize any appeal by a federal agency, including the EEOC, and its attorneys will ultimately decide the extent to which the EEOC may pursue its interpretations of Title VII in the appellate courts. *See* Justice Manual §§ 2-1.000 – 2-3.110. The government tries to dismiss this appellate supervision as "speculation," but DOJ's involvement as the appellate stage is as certain as the EEOC's involvement at the initial enforcement stage.

## III.   The Plaintiffs' Claims Are Ripe

The government's ripeness objections reiterate its claim that the plaintiffs must await a threat of EEOC enforcement directed specifically at them. *See* ECF No. 29 at 23 ("Plaintiffs do not allege any instance in which the EEOC has threatened Title VII litigation concerning the religious beliefs or employment-related policies or actions of any member of the Pastor Council or Braidwood."). No such requirement exists, either in Article III standing or ripeness doctrines. *See Doe*, 410 U.S. at 188–89; *Stenberg*, 530 U.S. at 945–46. Nor are the plaintiffs required to await an EEOC guidance document that is specifically directed at religious employers. *See* ECF No. 29 at 23 ("The EEOC has not announced any guidance regarding the application of its Title VII interpretations to religious organizations or closely-held, religiously-operated businesses."). The EEOC's brochure applies to *all* employers and refuses to recognize any exemptions for religious employers; it is clear from this document—as well as from the EEOC's lawsuit against Harris Funeral Homes—that the EEOC expects all employers to comply with its "guidance."

Braidwood's objections to the compelled posting of the EEOC sign are ripe because Braidwood is currently unwilling to propagate the EEOC's messages, and that remains the case regardless of whether the EEOC plans to amend the sign to include specific references to sexual orientation or gender identity. Braidwood is unwilling to post even the present-day iteration of the EEOC's sign, and its claim is entirely ripe. Finally, the government's claim that the plaintiffs will suffer no hardship from a delayed resolution of their RFRA claims is

demonstrably untenable. We have explained throughout this brief how the EEOC's "guidance document" and its lawsuit against the Harris Funeral Homes produce *in terrorem* effects that threaten the religious freedom of every religious employer.

## CONCLUSION

The defendants' renewed motion to dismiss should be denied.

Respectfully submitted.

Charles W. Fillmore
H. Dustin Fillmore
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

Dated: May 22, 2019

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on May 22, 2019, I served this document through CM/ECF upon:

Eric J. Soskin
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Room 12002
Washington, DC 20530
(202) 353-0533
eric.soskin@usdoj.gov

*Counsel for the Defendants*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs and*
*the Proposed Classes*