UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **U.S. Pastor Council**; **Bear Creek Bible Church** and **Braidwood Management Inc.**, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**Equal Employment Opportunity Commission**; **Janet Dhillon**, **Victoria A. Lipnic**, and **Charlotte A. Burrows**, in their official capacities as chair and commissioners of the Equal Employment Opportunity Commission; **William P. Barr**, in his official capacity as Attorney General of the United States; **United States of America**,<br><br>Defendants. | Case No. 4:18-cv-00824-O |

## PLAINTIFFS' SECOND AMENDED CLASS-ACTION COMPLAINT

Since 2015, the Equal Employment Opportunity Commission has claimed that Title VII outlaws employment discrimination on account of sexual orientation or gender identity. *See Baldwin v. Foxx*, EEOC Doc. No. 0120133080, 2015 WL 4397641 (EEOC July 16, 2015); *Macy v. Holder*, EEOC Doc. No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012); *see also* Exhibits 1–2 (EEOC guidance documents). The Supreme Court recently adopted a similar interpretation of Title VII's prohibition on sex discrimination. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020). But neither the text of Title VII nor the EEOC's regulatory guidance makes any exemptions or accommodations for employers that oppose homosexual or transgender behavior on religious grounds. The failure to provide a religious exemption

to this supposed anti-discrimination requirement violates the Religious Freedom Restoration Act and the First Amendment. The plaintiffs seek a declaratory judgment to that effect.

The plaintiffs also seek a declaration that Title VII's prohibition on "sex" discrimination, as interpreted in *Bostock*, allows any employer—religious or secular—to fire or refuse to hire bisexual employees, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. The plaintiffs also seek a declaration that Title VII (as interpreted in *Bostock*) allows employers to continue firing or (refusing to hire) employees who engage in homosexual or transgender behavior, by establishing rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological different were different.

## JURISDICTION AND VENUE

1.   The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.   Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.   Plaintiff U.S. Pastor Council is a nonprofit incorporated under the laws of Texas. The U.S. Pastor Council comprises approximately 1,000 member churches, including six in Fort Worth.

4.   Plaintiff Bear Creek Bible Church is a nonprofit incorporated under the laws of Texas. It is located in Tarrant County, Texas.

5.   Plaintiff Braidwood Management Inc. is a for-profit, closely held corporation incorporated under the laws of Texas.

6.     Defendant Equal Employment Opportunity Commission (EEOC) is an agency of the federal government. Its offices are located at 131 M Street NE, Washington, D.C. 20002. The EEOC is charged with enforcing Title VII of the Civil Rights Act of 1964.

7.     Defendants Janet Dhillon, Victoria A. Lipnic, and Charlotte A. Burrows are chair and commissioners of the Equal Employment Opportunity Commission. They are sued in their official capacities.

8.     Defendant William P. Barr is Attorney General of the United States. His office is located at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. The Attorney General, like the EEOC, is charged with enforcing Title VII, and he is empowered to bring civil actions to enforce the statute when a case is referred to him by the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1). His department also oversees and influences the litigation of federal agencies, especially on appeal and at the Supreme Court. Attorney General Barr is sued in his official capacity.

9.     Defendant United States of America is the federal government of the United States of America.

## STATEMENT OF FACTS

10.   Title VII of the Civil Rights Act of 1964 forbids employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

11.   Title VII also forbids an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2).

12.   The EEOC has interpreted these statutory prohibitions on "sex" discrimination to include discrimination on account of sexual orientation or gender identity. *See Baldwin v. Foxx*, EEOC Doc. No. 0120133080, 2015 WL 4397641 (EEOC July 16, 2015) (sexual orientation); *Macy v. Holder*, EEOC Doc. No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) (gender identity).

13.   The EEOC has also issued a "guidance document" that demands that employers recognize same-sex marriage on the same terms as opposite-sex marriage. *See* Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or Transgender Workers, available at https://bit.ly/2MnDzG5 (last visited on September 9, 2020) ("Examples of sex discrimination involving sexual orientation include . . . denying spousal health insurance benefits to a female employee because her legal spouse is a woman, while providing spousal health insurance to a male employee whose legal spouse is a woman.") (attached as Exhibits 1 and 2).

14.   The EEOC also demands that employers allow employees into restrooms that correspond to the "gender identity" that they assert—regardless of the individual's biological sex, regardless of whether the individual has had a sex-change operation, and regardless of any objections or privacy concerns that might be raised by other employees. *See Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (April 1, 2015); Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or Transgender Workers, available at https://bit.ly/2MnDzG5 (last visited on September 9, 2020) ("Title VII is violated where an employer denies an employee equal access to a common restroom corresponding to the employee's gender identity").

15.   The text of Title VII makes no exemptions or accommodations for employers that hold sincere religious objections to homosexuality or transgender behavior. The only religious accommodations in Title VII appear at 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e-2(e)(2), which allow religious organizations and religious

schools to limit employment to members of a particular religion. Nothing in Title VII exempts any religious employer from the statute's prohibition on sex discrimination.

16.   Because Title VII's statutory exemptions are constitutionally insufficient to protect the autonomy and religious freedom of churches and religious institutions, the Supreme Court has recognized a "ministerial exception" in the First Amendment, which categorically exempts a religious group's selection of its ministers from the reach of anti-discrimination law. *See, e.g., Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). This "ministerial exemption" protects the Catholic church from being forced to hire women as priests—notwithstanding the text of Title VII—and it protects other churches from being forced to hire practicing homosexuals as clergy. But this "ministerial exception" is no help to Christian-owned businesses that oppose homosexuality and transgender behavior on religious grounds. And the "ministerial exemption" does nothing to shield churches or religious schools that require non-ministerial employees such as secretaries and janitors to refrain from homosexual behavior.

17.   The EEOC refuses to acknowledge that RFRA and the First Amendment limit the application of Title VII to religious employers who object to homosexual and transgender behavior. And the EEOC readily brings lawsuits against Christian businesses that oppose these behaviors without regard to their rights under RFRA and the First Amendment. *See, e.g., EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018) (EEOC lawsuit against a Christian funeral home for refusing to allow a biologically female employee to dress like a man).

18.   Other policies, regulations, and executive orders adopted by the federal government attempt to prohibit discrimination on account of sexual orientation and gender identity without any exceptions or allowances for religious employers or institutions. *See, e.g.*, Executive Order 13672 (prohibiting government contractors from dis-

criminating on account of sexual orientation and gender identity, without any accommodations for religious institutions); 45 C.F.R. § 75.300(d) (requiring recipients of HHS grants to "treat as valid the marriages of same-sex couples," without any accommodations for religious institutions).

## BOSTOCK V. CLAYTON COUNTY

19.   On June 15, 2020, the Supreme Court announced its judgment in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

20.   *Bostock* holds that Title VII's prohibition on "sex" discrimination prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender."

21.   *Bostock* explained that an employer who fires an employee for conduct or personal attributes that it would tolerate in a person of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) automatically violates the statutory command of Title VII. The Court explained:

> If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 140 S. Ct. at 1741–42.

22.   *Bostock* also makes clear that an employer does *not* violate Title VII if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Bostock*, 140 S. Ct. at 1742.

23.    The implications of *Bostock* are far-reaching. The Court held that an employer violates Title VII *whenever* an employee's biological sex is a "but-for cause" of an adverse employment action. *See Bostock*, 140 S. Ct. at 1739 ("Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation. That form of causation is established *whenever* a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause. . . . So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." (citations and some internal quotation marks omitted)). The Court also held that this was the *only* permissible interpretation of the statutory language. *See Bostock*, 140 S. Ct. at 1749 ("[N]o ambiguity exists about how Title VII's terms apply to the facts before us.").

24.    These statements in *Bostock* prohibit employers from enforcing sex-specific dress or grooming codes. *See Bostock*, 140 S. Ct. at 1741 ("[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."). They also render employers incapable of preventing their employees from entering and using restrooms reserved for the opposite sex, regardless of the employee's purpose or desire for accessing the opposite-sex restroom. *See id.*; *id.* at 1745–46 ("[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination."). At the end of its opinion, the Court says that it "do[es] not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 1753. But no court can uphold the

legality of sex-specific dress codes and restrooms under Title VII without contradict-ing numerous statements that appear in the *Bostock* majority opinion.

## STATEMENT OF FACTS—U.S. PASTOR COUNCIL

25. The U.S. Pastor Council is a nonprofit corporation that comprises over 1,000 member churches.

26. The member churches of the U.S. Pastor Council believe that the Bible is the Word of God.

27. The Bible repeatedly and explicitly condemns homosexual behavior. *See, e.g.*, Romans 1:26–28; 1 Timothy 1:8–11; 1 Corinthians 6:9–11; Leviticus 18:22; Leviticus 20:13; Genesis 19:1–29.

28. The Bible also condemns cross-dressing and gender non-conforming behav-ior. *See* Deuteronomy 22:5 (KJV) ("A woman shall not wear anything that pertains to a man, nor shall a man put on a woman's garment, for all who do so are an abomina-tion to the LORD your God."). The Bible teaches that sex and gender are categories created by God, rather than a social or cultural construct or an individual choice. *See* Genesis 1:27 (KJV) ("So God created man in his own image, in the image of God created he him; male and female created he them.").

29. The member churches of the U.S. Pastor Council require their employees to live according to Biblical teaching on matters of sexuality and gender. Because of this, the churches will not consider practicing homosexuals, bisexuals, crossdressers, or transgender or gender non-conforming individuals for church employment—in-cluding employment for non-ministerial positions.

30. The member churches of the U.S. Pastor Council do not recognize same-sex marriage and will not offer benefits to same-sex partners of church employees. Indeed, any church employee who enters into a same-sex marriage would face imme-diate dismissal from employment.

31.   The member churches of the U.S. Pastor Council also require their employees to use the restroom designated for their biological sex. Church employees are not permitted to use restrooms designated for the opposite biological sex.

## STATEMENT OF FACTS—BEAR CREEK BIBLE CHURCH

32.   Bear Creek Bible Church is a nondenominational church located in Keller, Texas.

33.   Bear Creek Bible Church believes that the Bible is the Word of God. *See* paragraphs 27–28, *supra*.

34.   In 2015, Bear Creek Bible Church added the following statement to its bylaws:

> That God's plan for human sexuality is to be expressed only within the context of marriage, that God created man and woman as unique biological persons made to complete each other. God instituted monogamous marriage between male and female as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one genetic male and one genetic female (Gen 2:24; Matt 19:5–6, Mark 10:6–9; Romans 1:26–27; I Cor 6–9).

35.   Bear Creek Bible Church requires its employees to live according to Biblical teaching on matters of sexuality and gender. Because of this, the church will not consider practicing homosexuals, bisexuals, crossdressers, or transgender or gender nonconforming individuals for church employment—including employment for non-ministerial positions.

36.   Bear Creek Bible Church does not recognize same-sex marriage and will not offer benefits to same-sex partners of its employees. Indeed, any church employee who enters into a same-sex marriage would face immediate dismissal from employment.

37.   Bear Creek Bible Church also requires its employees to use the restroom designated for their biological sex. Church employees are not permitted to use restrooms designated for the opposite biological sex.

38.   Bear Creek Bible Church has at least 15 employees, so it is subject to the requirements of Title VII. Some of these employees are non-ministerial employees such as secretaries and custodians.

## STATEMENT OF FACTS—BRAIDWOOD MANAGEMENT INC.

39.   Dr. Steven F. Hotze is the founder, owner, and CEO of the Hotze Health & Wellness Center. The Hotze Health & Wellness Center is the DBA ("doing business as") name of Hotze Medical Association P.A., a Texas professional association.

40.   Dr. Hotze is a Christian, and he believes that the Bible is the Word of God. *See* paragraphs 27–28, *supra*. Dr. Hotze operates his businesses according to Christian and Biblical principles and teaching.

41.   The people who work at the Hotze Health & Wellness Center are employed by a separate management company called Braidwood Management Inc. Braidwood is a Texas corporation, and it is owned by a trust of which Dr. Hotze is the sole trustee and beneficiary. Dr. Hotze is also the President, Secretary, Treasurer, and sole member of the Board of Braidwood.

42.   Braidwood employs approximately 70 individuals, and its employees work at one of the following three business entities, each of which is owned or controlled by Dr. Hotze: the Hotze Health & Wellness Center, Hotze Vitamins, or Physicians Preference Pharmacy International LLC.

43.   Because Dr. Hotze operates his corporations as Christian businesses, he does not allow Braidwood to hire or employ individuals who are engaged in sexually immoral behavior or gender non-conforming conduct of any sort, including homosexuality, cross-dressing, and transgenderism.

44.   Dr. Hotze does not allow Braidwood to recognize same-sex marriage or extend benefits to an employee's same-sex partner, because that would lend approval to homosexual behavior and make him complicit in sin, in violation of his sincere religious beliefs.

45.   Dr. Hotze also will not allow Braidwood to recognize same-sex marriage because the law of Texas continues to define marriage as the union of one man and one woman, and the law of Texas continues to prohibit private employers such as Braidwood from recognizing homosexual marriage. *See* Tex. Const. art. I § 32 ("Marriage in this state shall consist only of the union of one man and one woman."); Tex. Family Code § 6.204(b) ("A marriage between persons of the same sex or a civil union is contrary to the public policy of this state and is void in this state."). Texas has not repealed or amended these laws in response to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Neither Dr. Hotze nor Braidwood is subject to the Supreme Court's interpretation of the Fourteenth Amendment in *Obergefell* because neither is a state actor.

46.   Dr. Hotze does not permit employees of Braidwood to use a restroom designated for members of the opposite biological sex—regardless of the gender identity that the employee asserts.

47.   Braidwood also enforces a sex-specific dress-and-grooming code that requires men and women to wear professional attire according to their biologically assigned sex. Men are forbidden to wear earrings, but women may. *See* Exhibit 4 at p. 3. Men who have customer contact must wear a tie (or bow tie); women are not required or even permitted to wear ties. *See id*. Women are allowed to wear skirts, blouses, shoes with heels, and fingernail polish, while men are forbidden to wear any of these accoutrements. *See id*. at 1–4. Cross-dressing of any sort is strictly prohibited.

48.   Dr. Hotze enforces this sex-specific dress-and-grooming code not only to maintain the professionalism of his businesses, but also because of his belief in the Bible, which requires men to dress as men and requires women to dress as women.

*See* Deuteronomy 22:5 (KJV) ("A woman shall not wear anything that pertains to a man, nor shall a man put on a woman's garment, for all who do so are an abomination to the LORD your God.").

49.   Braidwood is self-insured and provides health insurance to its employees. Because Braidwood has more than 50 employees, it is compelled to offer ACA-compliant health insurance or face heavy financial penalties. *See* 26 U.S.C. § 4980H(c)(2).

50.   Braidwood's self-insured health plan is administered by a company called Entrust.

51.   On December 20, 2018, Entrust issued a new Employee Benefit Plan Document (also known as the Summary Plan Description) for Braidwood's self-insured health plan, which describes changes to the plan that took effect on December 1, 2018. *See* Exhibit 5.

52.   In this document, Entrust redefined the term "spouse" to include individuals in same-sex marriages. Entrust made this change on its own initiative, without Dr. Hotze's knowledge or approval.

53.   Because of this change, Braidwood's health plan now recognizes same-sex marriage effective December 1, 2018, even though this is contrary to Dr. Hotze's religious beliefs.

54.   On January 27, 2019, Dr. Hotze discovered that this change had been made to Braidwood's health plan. On February 14, 2019, Dr. Hotze wrote a letter to Entrust that stated:

> I am unwilling to allow Braidwood's plan to recognize same-sex marriage. Braidwood is a Christian business and I operate all of my businesses according to Christian beliefs and teaching. I cannot allow Braidwood's plan to define marriage in a manner that contradicts my religious beliefs or Christian teaching on marriage and sexuality.

I therefore respectfully ask you to amend the definition of "spouse" to include only marriages between one man and one woman.

If you believe that the law prohibits Entrust from amending Braidwood's plan in this manner, please write back to me and let me know. I do not want Entrust to violate the law, and if you believe that the law prevents you from accommodating this request then I will seek declaratory relief in court against the relevant government officials.

*See* Exhibit 6.

55.   On February 22, 2019, Entrust wrote back to Dr. Hotze and wrote:

[W]e firmly believe that our current definition of "spouse" in the [Summary Plan Description] is in line with the clear law of the United States. However, we completely understand that you feel differently due to religious convictions and personal beliefs, which we obviously respect. As the Plan Sponsor of the Braidwood Employee Benefit Plan Trust, you control the terms of your plan. If you feel that you need to take legal action on this issue, that is completely up to you as the Trustee. We respect your decision to do so, but we cannot influence your decision one way or another on pursuing same.

*See* Exhibit 7.

**Claim 1:    The Religious Freedom Restoration Act Compels Exemptions To *Bostock*'s Interpretation Of Title VII**

56.   The Religious Freedom Restoration Act (RFRA) prohibits the federal government from substantially burdening the exercise of religion. 42 U.S.C. § 2000bb-1. The only exception is when the federal government demonstrates that the application of the burden to the affected individual represents the "least restrictive means" of advancing "a compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *De-Otte v. Azar*, 332 F.R.D. 173, 188 (N.D. Tex. 2019).

57.   Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, substantially burdens the plaintiffs' religious freedom by preventing them from operating their places of employment in accordance with Christian teaching.

58.   There is no compelling governmental interest in forcing objecting religious employers to comply with *Bostock*'s interpretation of Title VII, which is evident from

the fact that Congress has refused to enact legislation to compel these objecting religious employers to comply with this novel interpretation of Title VII.

59.    The plaintiffs bring this claim on behalf of a class of all employers in the United States who oppose homosexual or transgender behavior for sincere religious reasons.

60.    The plaintiffs request a declaratory judgment that RFRA protects the class members' prerogatives to: (a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuse to recognize same-sex marriage or offer benefits to same-sex partners of their employees; (d) Enforce sex-specific dress and grooming codes; and (e) Prohibit employees from entering or using restrooms designated for the opposite biological sex.

### Claim 2:    The Free-Exercise Clause Compels Exemptions To *Bostock*'s Interpretation Of Title VII

61.    Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, violates the Free Exercise Clause by failing to exempt religious employers from its prohibition on sex discrimination.

62.    Title VII is not a law of "general applicability" because it exempts religious employers from its prohibition on religious discrimination. *See* 42 U.S.C. § 2000e-1(a) ("This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."). Title VII also exempts employers with fewer than 15 employees. *Oregon v. Smith*, 494 U.S. 872

(1990), is therefore inapplicable, and the plaintiffs' Free Exercise claims should be analyzed under the strict scrutiny of *Sherbert v. Verner*, 374 U.S. 398 (1963).

63.   If *Oregon v. Smith* forecloses the plaintiffs' free-exercise claims, then *Oregon v. Smith* should be overruled.

64.   The plaintiffs bring this claim on behalf of a class of all employers in the United States who oppose homosexual or transgender behavior for sincere religious reasons.

65.   The plaintiffs request a declaratory judgment that the Free Exercise Clause protects the class members' prerogatives to: (a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuse to recognize same-sex marriage or offer benefits to same-sex partners of their employees; (d) Enforce sex-specific dress and grooming codes; and (e) Prohibit employees from entering or using restrooms designated for the opposite biological sex.

**Claim 3:**   **The First Amendment Right Of Expressive Association Compels Exemptions To *Bostock*'s Interpretation Of Title VII**

66.   Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, violates the First Amendment right of expressive association by failing to exempt employers who oppose homosexual or transgender behavior. *See Boy Scouts v. Dale*, 530 U.S. 640 (2000).

67.   The plaintiffs bring this claim on behalf of a class of all employers in the United States who oppose homosexual or transgender behavior for religious or non-religious reasons.

68.   The plaintiffs request a declaratory judgment that the First Amendment right of expressive association protects the class members' prerogatives to: (a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuse to recognize same-sex marriage or offer benefits to same-sex partners of their employees; (d) Enforce sex-specific dress and grooming codes; and (e) Prohibit employees from entering or using restrooms designated for the opposite biological sex.

### Claim 4:   Title VII, As Interpreted In *Bostock*, Does Not Prohibit Discrimination Against Bisexual Employees

69.   *Bostock*'s interpretation of Title VII does not prohibit discrimination against bisexual employees, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *See, e.g.*, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1742 (2020) ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent."); *see also id.* at 1740 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex . . . discriminates against that person in violation of Title VII.").

70.   The EEOC's website, however, incorrectly states that *Bostock* prohibits "firing individuals because of their sexual orientation," even though it remains legal to fire an individual because of a bisexual orientation that would not be tolerated in someone of the opposite sex. *See* https://bit.ly/2ZnB0bI (last visited on September 9, 2020) (attached as Exhibit 3).

71.   The plaintiffs request a declaratory judgment that Title VII allows employers to discriminate against bisexuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman.

72.   The plaintiffs bring this claim on behalf of a class of all employers in the United States who oppose homosexual or transgender behavior for religious or non-religious reasons.

**Claim 5:   Title VII, As Interpreted In *Bostock*, Does Not Prohibit Employers From Establishing Sex-Neutral Rules Of Conduct That Exclude Practicing Homosexuals And Transgender Individuals From Employment**

73.   *Bostock*'s interpretation of Title VII does not prohibit employers from firing or refusing to hire individuals who engage in homosexual or transgender conduct, so long the employer has established rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological different were different. These rules include, but are not limited to, any of the following:

No employee, male or female, may enter a gay bar or gay bathhouse.

No employee, male or female, may engage in the sexual practices associated with homosexuality.

No employee, male or female, may engage in "deviate sexual intercourse," as that term is defined in section 25.02 of the Texas Penal Code.[1]

No employee, male or female, may use Grindr (or other dating apps used primarily by homosexuals).

No employee, male or female, may seek or obtain hormone therapy unless it is prescribed for a medical condition other than gender dysphoria.

---

1. Section 25.02 defines "deviate sexual intercourse" as "any contact between the genitals of one person and the mouth or anus of another person with intent to arouse or gratify the sexual desire of any person."

> No employee, male or female, may undergo surgery to modify their genitals, unless that surgery is needed for a medical condition other than gender dysphoria.

Rules of this sort obviously have a disparate impact on homosexual and transgender employees, but that is not a problem under Title VII, which prohibits only discrimination on account of "sex." *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1746–47 (2020) ("We agree that homosexuality and transgender status are distinct concepts from sex."). Sex-neutral rules of conduct remain permissible under *Bostock*, so long as the employer can truthfully assert that he would fire an employee of the opposite sex for the identical conduct. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1742 (2020) ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.").

74.   The plaintiffs request a declaratory judgment that Title VII allows employers to refuse to employ individuals who engage in homosexual or transgender behavior, so long as they do so according to rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological sex were different.

75.   The plaintiffs bring this claim on behalf of a class of all employers in the United States who oppose homosexual or transgender behavior for religious or non-religious reasons.

## FACTS RELATED TO STANDING

76.   The U.S. Pastor Council has associational standing to challenge the EEOC's interpretation of Title VII.

77.   The U.S. Pastor Council is a membership organization. To become a member of the U.S. Pastor Council, a pastor and its church must submit a membership application and pay a $250 annual membership fee. Pastors who apply for membership must review the Pastors' Declaration on Godly Citizenship and affirm they agree with its principles and commit to its implementation. All of this is explained on the U.S.

Pastor Council's website: http://www.uspastorcouncil.org/get-involved/join-uspc.html (last visited on September 9, 2020).

78. To establish associational standing, the U.S. Pastor Council must show that: (a) its member churches would have standing to sue in their own right; (b) the rights of religious freedom and church autonomy that it seeks to vindicate in this lawsuit are germane to the organization's purpose; and (c) neither the claims asserted nor the relief demanded requires the individual member churches to participate in the lawsuit. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

79. The individual member churches of the U.S. Pastor Council include churches that are subject to Title VII because they have 15 or more employees.

80. The member churches of the U.S. Pastor Council engage in conduct prohibited by *Bostock*'s interpretation of Title VII. Specifically, they (a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuse to recognize same-sex marriage or offer benefits to same-sex partners of their employees; and (d) Prohibit employees from entering or using restrooms designated for the opposite biological sex. Some of these churches also enforce sex-specific dress and grooming rules.

81. These churches are suffering "injury in fact" because *Bostock*'s interpretation of Title VII threatens them with penalties and lawsuits for following the teachings of their Christian faith.

82. These member churches are suffering an additional "injury in fact" because *Bostock*'s interpretation of Title VII compels them to violate the teachings of their religion regardless of whether they choose to comply with the statute. If the member churches choose to comply with Title VII's prohibition on "sex" discrimination, then

they will contradict the Bible's teachings on homosexuality. *See, e.g.*, Romans 1:26–28; 1 Timothy 1:8–11; 1 Corinthians 6:9–11; Leviticus 18:22; Leviticus 20:13; 1 Timothy 2:12. But if the member churches choose to disregard the statute in the absence of judicial relief, then they will violate the Bible's instruction to obey the civil authorities. *See* Romans 13:1–2 (NIV) ("[1]Let everyone be subject to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God. [2]Consequently, whoever rebels against the authority is rebelling against what God has instituted, and those who do so will bring judgment on themselves."). This makes it impossible for the member churches to operate without violating one or more of their sincere religious convictions. This inflicts "injury in fact" and substantially burdens the members churches' exercise of their Christian faith.

83.   These "injuries in fact" are "fairly traceable" to the defendants, who are charged with enforcing Title VII as interpreted by the Supreme Court, and they will be redressed by the requested declaratory relief.

84.   Defending the right of religious freedom and the right of churches to require their employees to follow the Bible's standards for conduct is germane to the U.S. Pastor Council's purpose. The U.S. Pastor Council's Declaration of Godly Citizenship, which appears on the Council's website, declares, among other things:

> **We believe** that the **Holy Bible is inerrant, infallible and inspired by God**; it is the only revealed source of all truth relevant to the governing of the person and of nations.

> **We believe** that **all authorities are subordinate to God**, including family, church and government authorities, therefore the actions and decisions of each will be accountable to Him.

> **We believe** that the church has a unique and sacred role in **proclaiming Gods principles** to leaders of a city, state and nation . . . .

<u>**We believe**</u> that **marriage is a God-created relationship as the life-time union of one natural man and one natural woman** for the blessing of both, the good of the people and the foundation of the family for legitimate procreation.

<u>**We believe**</u> that the **traditional, nuclear family of a married father and mother raising their biological and/or adopted children** in a nurturing and protective environment is the essential building block of a stable community and a nation; it therefore must be promoted and protected by both church and state. . . .

http://www.uspastorcouncil.org/who-we-are/uspc-pastors-declaration-of-godly-citizenship.html (last visited on September 9, 2020).

85.  Neither the claims asserted nor the relief demanded requires the individual member churches of the U.S. Pastor Council to participate in the lawsuit

## FACTS RELATED TO STANDING—BEAR CREEK BIBLE CHURCH

86.  Bear Creek Bible Church is subject to Title VII because it has 15 or more employees. Some of these employees are non-ministerial employees such as secretaries and custodians.

87.  Bear Creek Bible Church engages in conduct prohibited by *Bostock*'s interpretation of Title VII. Specifically, Bear Creek Bible Church (a) Refuses to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuses to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuses to recognize same-sex marriage or offer benefits to same-sex partners of its employees; and (d) Prohibits employees from entering or using restrooms designated for the opposite biological sex.

88.  Bear Creek Bible Church is suffering "injury in fact" because *Bostock*'s interpretation of Title VII threatens it with penalties and lawsuits for following the teachings of its Christian faith.

89.   Bear Creek Bible Church is suffering an additional "injury in fact" because *Bostock*'s interpretation of Title VII compels the church to violate the teachings of its Christian faith regardless of whether it chooses to comply with the statute. If Bear Creek chooses to comply with Title VII's prohibition on "sex" discrimination, then it will contradict the Bible's teachings on homosexuality. *See, e.g.*, Romans 1:26–28; 1 Timothy 1:8–11; 1 Corinthians 6:9–11; Leviticus 18:22; Leviticus 20:13; 1 Timothy 2:12. But if Bear Creek chooses to disregard the statute in the absence of judicial relief, then it will violate the Bible's instruction to obey the civil authorities. *See* Romans 13:1–2 (NIV) ("[1]Let everyone be subject to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God. [2]Consequently, whoever rebels against the authority is rebelling against what God has instituted, and those who do so will bring judgment on themselves."). This makes it impossible for Bear Creek to operate without violating one or more of its sincere religious convictions. This inflicts "injury in fact" and substantially burdens Bear Creek's exercise of its Christian faith.

90.   These "injuries in fact" are "fairly traceable" to the defendants, who are charged with enforcing Title VII as interpreted by the Supreme Court, and they will be redressed by the requested declaratory relief.

### FACTS RELATED TO STANDING—BRAIDWOOD MANAGEMENT INC.

91.   Braidwood Management Inc. has suffered or will suffer numerous injuries in fact:

> (1) It cannot operate its business in accordance with its Christian faith without exposing itself to a risk of penalties and lawsuits;
>
> (2) It is being forced to choose between two outcomes that will violate its religious convictions, as it must either defy Title VII as interpreted by the Supreme Court (which violates its religious duty to obey the civil authorities) or comply with *Bostock* (which violates its religious convictions regarding homosexual and transgender behavior);

(3) Its third-party administrator unilaterally changed the terms of its self-insured health plan to recognize same-sex marriage, out of a belief that this change was compelled by law;

(4) Braidwood must choose between acquiescing to the third-party administrator's changes, or instructing its third-party administrator to do something that the administrator regards as illegal, either of which imposes injury on Braidwood by either violating its religious convictions or harming its relationship with its third-party administrator.

92.   These "injuries in fact" are "fairly traceable" to the defendants, who are charged with enforcing Title VII as interpreted by the Supreme Court, and they will be redressed by the requested declaratory relief.

93.   The first two injuries in fact are directly caused by Title VII's prohibition on "sex" discrimination and the defendants' duty to enforce it. Because the EEOC enforces Title VII through litigation, the Attorney General and the Department of Justice necessarily have a role in the enforcement of Title VII, especially when an EEOC lawsuit is appealed or reaches the Supreme Court.

94.   The third and fourth injuries are fairly traceable to the EEOC's refusal to publicly acknowledge that the rights of religious employers under federal RFRA trump any obligation to recognize same-sex marriage or comply with *Bostock*'s interpretation of Title VII.

95.   The EEOC is already suing religious employers for violating its interpretation of Title VII — and it will continue doing so unless it is stopped by this Court. *See EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018).

## CLASS-ACTION ALLEGATIONS

96.   The plaintiffs bring this class action under Rule 23(b)(2) of the federal rules of civil procedure.

97.   Plaintiffs Bear Creek Bible Church and Braidwood Management Inc. seek to represent two classes. The first class comprises all employers in the United States

who oppose homosexual or transgender behavior for sincere religious reasons. The second class comprises all employers in the United States who oppose homosexual or transgender behavior for religious or non-religious reasons. Bear Creek and Braidwood seek to be appointed joint representatives of each of these two classes.

98.   The number of employers in each of the two classes makes joinder of the individual class members impractical.

99.   There are questions of law common to the first class, including: (a) Whether RFRA compels exemptions to *Bostock*'s interpretation of Title VII; and (b) Whether the Free Exercise Clause compels exemptions to *Bostock*'s interpretation of Title VII.

100.  There are questions of law common to the second class including: (a) Whether the First Amendment right of expressive association compels exemptions to *Bostock*'s interpretation of Title VII; (b) Whether Title VII, as interpreted in *Bostock*, allows employers to discriminate against bisexuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman; and (c) Whether Title VII, as interpreted in *Bostock*, allows employers to exclude homosexuals and transgender individuals from employment by establishing sex-neutral rules of conduct.

101.  Bear Creek and Braidwood's claims are typical of other members of the classes. Each of them wishes to preserve their rights to (a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexuality; (b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex; (c) Refuse to recognize same-sex marriage or offer benefits to the same-sex partners of its employees; (d) Enforce sex-specific dress and grooming codes; and (e) Prohibit employees from entering or using restrooms designated for the opposite biological sex.

102. Bear Creek and Braidwood adequately represent the interests of the classes, and they have no interests antagonistic to either of the classes.

103. A class action is appropriate under Rule 23(b)(2) because the defendants are acting on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

### DEMAND FOR RELIEF

104. The plaintiffs respectfully request that the court:

a.      certify a class of all employers in the United States who oppose homosexual or transgender behavior for sincere religious reasons;

b.      certify a separate class of all employers in the United States who oppose homosexual or transgender behavior for religious or non-religious reasons;

c.      award the declaratory relief described in paragraphs 60, 65, 68, 71, and 74;

d.      award costs and attorneys' fees under 42 U.S.C. § 1988;

e.      award all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

CHARLES W. FILLMORE
H. DUSTIN FILLMORE
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
chad@fillmorefirm.com
dusty@fillmorefirm.com

Dated: September 9, 2020

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on September 9, 2020, I served this document through CM/ECF

upon:

Eric J. Soskin
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Room 12002
1100 L Street, NW
Washington, D.C. 20530
(202) 353-0533
eric.soskin@usdoj.gov

*Counsel for Defendants*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs and*
*the Proposed Classes*