## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| Bear Creek Bible Church, *et al.*, <br><br><br> *Plaintiffs*, <br><br> v. <br><br> Equal Employment Opportunity Commission, *et al.*, <br><br> *Defendants*. | Civil Action No. 4:18-cv-00824-O |

## BRIEF *AMICUS CURIAE* OF
## THE BECKET FUND FOR RELIGIOUS LIBERTY
## IN SUPPORT OF PLAINTIFFS

Luke W. Goodrich
Bar No. 977736DC
Joseph C. Davis
Bar No. 1047629DC
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
lgoodrich@becketlaw.org

*Attorneys for* Amicus Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF THE AMICUS ......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ..................................................................................................... 3

    I.   Title VII does not apply to decisions by religious employers based
        on an employee's religious observances and practices. .................................... 3

        A. Text ......................................................................................................... 3

        B. Precedent ................................................................................................ 5

        C. *Bostock* ................................................................................................. 8

        D. EEOC's own guidance ......................................................................... 10

    II.  Constitutional avoidance requires a plain-language interpretation
        of Title VII's religious exemption. ................................................................ 11

        A. Religious autonomy .............................................................................. 11

        B. Constitutional avoidance ...................................................................... 16

CONCLUSION ................................................................................................ 18

CERTIFICATE OF SERVICE ....................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aparicio v. Christian Union, Inc.*,
  No. 18-cv-0592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) .............................. 14

*Billard v. Charlotte Catholic High Sch.*,
  No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ........................... 9

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ......................................................................................*passim*

*Boustany v. Xylem Inc.*,
  235 F. Supp. 3d 486 (S.D.N.Y. 2017) ....................................................................... 5

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ......................................................................... 12, 14

*Cannata v. Catholic Diocese of Austin*,
  700 F.3d 169 (5th Cir. 2012) ........................................................................... 12, 14

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
  Saints v. Amos*,
  483 U.S. 327 (1987) ................................................................................... 2, 3, 12

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006).............................................................................*passim*

*Demkovich v. St. Andrew the Apostle Parish*,
  343 F. Supp. 3d 772 (N.D. Ill. 2018) ..................................................................... 13

*Digit. Realty Tr., Inc. v. Somers*,
  138 S. Ct. 767 (2018) ............................................................................................... 3

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) ................................................................................................. 5

*EEOC v. Miss. Coll.*,
  626 F.2d 477 (5th Cir. 1980) .................................................................... 5, 6, 7, 8

*EEOC v. Pac. Press Pub. Ass'n*,
  676 F.2d 1272 (9th Cir. 1982) ................................................................. 4, 6, 7, 9

*Fitzgerald v. Roncalli High Sch., Inc.*,
    No. 1:19-cv-04291 (S.D. Ind. filed Oct. 21, 2019) .................................................... 1

*Garrick v. Moody Bible Inst.*,
    412 F. Supp. 3d 859 (N.D. Ill. 2019) ............................................................... 13, 14

*Hall v. Baptist Mem'l Health Care Corp.*,
    215 F.3d 618 (6th Cir. 2000) ......................................................................... 15-16

*Herx v. Diocese of Ft. Wayne-South Bend, Inc.*,
    48 F. Supp. 3d 1168 (N.D. Ind. 2014) ...................................................................... 7

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ............................................................................ 1, 11-12, 15

*Kennedy v. St. Joseph's Ministries, Inc.*,
    657 F.3d 189 (4th Cir. 2011) ..................................................................................... 4

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ................................................................................... 11

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991).................................................................................. 3, 7

*Maguire v. Marquette Univ.*,
    627 F. Supp. 1499 (E.D. Wis. 1986) ......................................................................... 7

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ................................................................................... 15

*NLRB v. Catholic Bishop of Chi.*,
    440 U.S. 490 (1979) ..................................................................................... 11, 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ............................................................................... 1, 10, 12

*Rayburn v. Gen. Conf. of Seventh-day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ................................................................................... 7

*Rogers v. Pearland Indep. Sch. Dist.*,
    827 F.3d 403 (5th Cir. 2016) ................................................................................... 16

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
    No. 1:19-cv-03153, 2021 WL 3669050 (S.D. Ind. Aug. 11, 2021) ........................... 1

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) ................................................................................ 12

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ........................................................... 11, 17

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ............................................................................ 13

## Statutes

42 U.S.C. § 2000e ...............................................................................*passim*

42 U.S.C. § 2000e-1 ...........................................................................*passim*

42 U.S.C. § 2000e-2 ................................................................................... 3

Pub. L. 88-352, 78 Stat. 255 (July 2, 1964) ............................................... 3

## Other Authorities

Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment
   Discrimination: Can Religious Organizations Continue to Staff on a
   Religious Basis?*, 4 Oxford J.L. & Relig. 368 (2015) ................................. 8

EEOC Compliance Manual ................................................................... 10, 11

## INTEREST OF THE *AMICUS*

The Becket Fund for Religious Liberty is a nonprofit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. It has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Native Americans, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world.

Becket has successfully litigated multiple Supreme Court cases on behalf of religious organizations sued under federal employment-discrimination laws. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). It has also handled, and is currently handling, multiple cases involving the scope of Title VII's religious exemption. *See, e.g., Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, No. 1:19-cv-03153, 2021 WL 3669050 (S.D. Ind. Aug. 11, 2021); *Fitzgerald v. Roncalli High Sch., Inc.*, No. 1:19-cv-04291 (S.D. Ind. filed Oct. 21, 2019). It offers this brief to address the proper scope of that exemption, as well as important constitutional protections for religious autonomy that have not been fully briefed by the parties.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title VII provides that it "shall not apply to" a religious organization "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). It then defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

As this Court has noted (Dkt. 110), there are two competing interpretations of this exemption. Some courts hold that the exemption permits religious organizations merely to favor individuals of the same faith. So, for example, a Catholic organization

can limit hiring to Catholics, and it cannot thereby be sued for "religious" discrimination. Other courts hold that the exemption allows religious organizations "to create and maintain communities composed solely of individuals faithful to their doctrinal *practices*." *Curay-Cramer*, 450 F.3d at 141 (emphasis added). So, for example, a Catholic organization can limit hiring to individuals who refrain from the practice of abortion or same-sex marriage, and it cannot thereby be sued for "sex" or "sexual orientation" discrimination. *Id.* (barring "sex" discrimination claim based on support for abortion).

As explained below, a straightforward reading of the exemption's text requires the latter approach. That is, the exemption doesn't merely bar claims of religious discrimination. Rather, it bars *all* claims of discrimination when a religious employer makes an employment decision based on an individual's religious belief *or conduct*. This understanding of the exemption is confirmed by precedent, by the Supreme Court's decision in *Bostock*, and by the EEOC's own guidance documents.

Moreover, a contrary understanding of the exemption would raise serious problems under the constitutional doctrine of religious autonomy, which protects the right of religious organizations to select employees who are fully committed to the organizations' religious beliefs and practices. Constitutional avoidance thus counsels against a narrow interpretation of Title VII's religious exemption.[1]

---

[1]   This brief does not address application of Title VII to Braidwood Management Inc. As noted in Plaintiffs' supplemental brief, several courts use a multi-factor test to determine whether an organization qualifies as a "religious corporation, association, educational institution, or society." Dkt. 111 at 1-3 (collecting cases); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 344 (1987) (Brennan, J., concurring) (discussing application of Title VII to "*nonprofit* activities"). On this record, it is unclear whether Braidwood would qualify. Plaintiffs also suggest it is not "tenable to assert that Braidwood is employing 'individuals of a particular religion.'" Dkt. 111 at 7. *Amicus* has doubts about Plaintiffs' legal analysis on this point, but on this record, this issue is also unclear. By contrast, Bear Creek Bible Church indisputably qualifies as a religious corporation and squarely presents the legal question of the scope of Title VII's religious exemption—which is the subject of this brief.

## ARGUMENT

### I. Title VII does not apply to decisions by religious employers based on an employee's religious observances and practices.

#### A. Text

We begin with the statutory text.[2] This Court must interpret Title VII's religious exemption according to its plain meaning. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738-39 (2020).

Here, the text is straightforward. Title VII states that it "shall not apply" to religious employers when they employ "individuals of a particular religion." 42 U.S.C. § 2000e-1(a). It then defines "religion" to include not just "belief," but "*all aspects of religious observance and practice*." *Id.* § 2000e(j) (emphasis added). "When a statute includes an explicit definition, [courts] must follow that definition." *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776-77 (2018). Doing so here yields the following: "This subchapter [*i.e.*, Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular [religious "belief," "observance," or "practice"]." 42 U.S.C. §§ 2000e-1(a), 2000e(j). In other words, religious employers have statutory "permission to employ only persons whose beliefs *and conduct* are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (emphasis added).

As this Court is aware, Dkt. 110 at 1, one early Ninth Circuit decision reached a contrary understanding of § 2000e-1(a)—that it "provides only a limited exemption"

---

[2]   Title VII includes two separate religious exemptions. One applies generally to all religious employers. 42 U.S.C. § 2000e-1(a). The other is specific to religious schools. 42 U.S.C. § 2000e-2(e)(2). Prior to 1972, the two exemptions had slightly different operative language. The general exemption applied only if the relevant employee was performing work connected with the organization's "*religious* activities." Pub. L. 88-352, Title VII, § 702, 78 Stat. 255 (July 2, 1964) (emphasis added). The school-exemption, however, lacked this limitation, meaning that it applied to *all* employees of religious schools, regardless of their connection with "religious activities." In 1972, Congress amended the general exemption to eliminate the "religious activities" limitation. *See Amos*, 483 U.S. at 332 n.9. So the two exemptions now have functionally identical language. *Compare* 42 U.S.C. § 2000e-1(a) ("employment of individuals of a particular religion") *with* 42 U.S.C. § 2000e-2(e)(2) ("employ employees of a particular religion"). For the sake of simplicity, this brief focuses on the general exemption.

protecting religious organizations from claims of religious discrimination, but not claims of discrimination based on any other prohibited ground. *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1276-77 (9th Cir. 1982). But the Ninth Circuit's decision was based largely on "legislative history" (which the court misread, *see infra*), not statutory text. *Id.* Again, the exemption's text doesn't turn on the nature of the *plaintiff's claim*; it turns on the nature of the *employer's conduct*—specifically, whether the employer is employing an individual based on his religious "belief," "observance," or "practice." 42 U.S.C. § 2000e(j). If so, the exemption applies—however the plaintiff articulates his claim.

This is confirmed by the exemption's structure, which is simple: "[law X] shall not apply" to religious employers "with respect to [conduct Y]." 42 U.S.C. § 2000e-1(a). The *law* that shall not apply is "[t]his subchapter"—which is *all* of Title VII, not just the ban on religious discrimination. *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192-94 (4th Cir. 2011). And the *conduct* that is protected is the "employment of individuals of a particular" "belief," "observance," or "practice." Thus, the meaning is clear: When a religious employer engages in the relevant conduct—making an employment decision based on an individual's religious "belief," "observance," or "practice"—Title VII does not apply.

This structural point is further reinforced by attending to the *other* half of § 2000e-1(a)—the "alien" exemption. Section 2000e-1(a) doesn't just include the religious exemption at issue here; instead, it includes *two* exemptions introduced using the same language: "This subchapter shall not apply *to an employer with respect to the employment of aliens outside any State*, or to a religious [employer] with respect to the employment of individuals of a particular religion … ." (emphasis added). If the religious exemption were somehow limited only to certain types of Title VII claims (*i.e.*, of religious discrimination), one would expect the alien exemption to have a parallel limitation (*i.e.*, claims of race or national-origin discrimination). But the Supreme Court

4

has described the alien exemption as an exemption from "*the statute*," not just from certain claims. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 253 (1991) (emphasis added). And courts have in fact applied the alien exemption to dismiss *sex*-discrimination claims, *Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 487-88, 491-96 (S.D.N.Y. 2017), with no decision of which *amicus* is aware suggesting the exemption has any limitation analogous to the one some courts have imposed on the religious exemption.

If Congress wanted to limit the religious exemption to religious-discrimination *claims*, it easily could have done so. It could have changed the *law* that shall not apply—from "[t]his subchapter" to "[t]his subchapter's *prohibition on religious discrimination*." Alternatively, it could have framed the exemption in terms of the plaintiff's *claim* instead of the employer's *conduct*—stating that this subchapter shall not apply to a religious employer "with respect to *claims of religious discrimination*." It did neither. Instead, it barred application of *all* Title VII claims when a religious employer makes a decision based on an individual's religious beliefs, observances, or practices.

## B. Precedent

This straightforward reading of the text is confirmed by precedent. Indeed, the Fifth Circuit long ago addressed the competing interpretations of the religious exemption's breadth—rejecting the narrow reading later adopted by the Ninth Circuit in *Pacific Press*. *See EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980).

In *Mississippi College*, a professor filed charges of sex and race discrimination after she was passed over for a vacancy. *Id.* at 479-80. The college said it had a preference for hiring Baptists, and—invoking the religious exemption—refused to comply with an EEOC subpoena. *Id.* at 480-81. On the *Pacific Press* court's understanding of Title VII, the religious exemption would have been irrelevant, since the professor's claims were of sex and race discrimination, not religious discrimination. But the Fifth

5

Circuit rejected this understanding, holding instead that "[i]f the district court determines on remand that the College applied its policy of preferring Baptists over non-Baptists in granting the faculty position to [another applicant] rather than [plaintiff], then § 702 exempts that decision from the application of Title VII and would preclude any investigation by the EEOC." *Id.* at 484-86.

*Mississippi College* thus demonstrates that the exemption bars *all* types of Title VII claims—including race and sex discrimination claims—when a religious employer makes an employment decision based on religion. And while *Mississippi College* involved an employment policy based on an employee's denominational affiliation, rather than the employee's conduct, recognizing its relevance to the latter is (as already explained) just a matter of plugging the express statutory definition of "religion" in § 2000e(j) into the exemption in § 2000e-1(a).[3]

Decisions from other Circuits illustrate the point, on facts closely analogous to those here. In *Curay-Cramer*, for example, a Catholic school dismissed a teacher for engaging in pro-choice advocacy in violation of Catholic teaching. 450 F.3d at 132. The teacher then sued the school under Title VII for sex discrimination, alleging that the school had treated her more harshly than male teachers who had violated other Catholic teachings. *Id.*

The court, however, held that her claim must be dismissed based on Title VII's religious exemption. As the Third Circuit explained, "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at

---

[3]      Ironically, *Pacific Press* purported to rely on *Mississippi College*, asserting that the Fifth Circuit had held that "the college must comply with an EEOC subpoena issued in connection with an investigation into charges of discrimination." 676 F.2d at 1277. But this flatly misreads *Mississippi College*, which, again, held that if the district court concluded that the challenged decision was an application of the college's religious-employment policy, that would "*preclude any investigation* by the EEOC." 626 F.2d at 485-86 (emphasis added); *see also id.* at 489 ("We leave for resolution by the district court on remand the question of what portions of the EEOC's subpoena should be enforced.").

141 (quoting *Little*, 929 F.2d at 951). Because the school had "offer[ed] a religious justification" for its decision—that the teacher had violated Church doctrine by promoting abortion—the teacher's claim was barred, even though the claim complained of sex (rather than religious) discrimination. *Id.* at 141-42 (citing *Miss. Coll.*, 626 F.2d at 485).

Other cases are to the same effect. *See, e.g., Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1502-04 (E.D. Wis. 1986) (applying exemption to sex-discrimination claim; "There is no question but that the government has a significant interest in eradicating sex discrimination. But as Title VII and the First Amendment recognize, the right to exercise religious faith free of governmental interference is fundamental."), *aff'd in part and vacated in part on other grounds*, 814 F.2d 1213 (7th Cir. 1987). And although some courts have adopted the Ninth Circuit's narrow understanding of the exemption, *see, e.g., Herx v. Diocese of Ft. Wayne-South Bend, Inc.*, 48 F. Supp. 3d 1168, 1174-76 (N.D. Ind. 2014) (collecting cases), those decisions are mistaken.

*Pacific Press* reasoned that the exemption must be limited to claims of religious discrimination because, while the "original version" of Title VII exempted religious organizations "entirely," the final version did not. 676 F.2d at 1276-77; *accord Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1166-67 (4th Cir. 1985). But this reasoning is based on a false dichotomy. Congress was not limited to one of two options: either exempt religious organizations entirely or exempt them only from claims of religious discrimination. It also had a third option: exempt religious organizations whenever they make employment decisions based on religious belief or practice. This is broader than an exemption from claims of religious discrimination, but narrower than a complete exemption. And this is the option Congress in fact chose, as demonstrated by the exemption's plain text. *See supra.*

Applying the better-reasoned precedents here, Title VII's religious exemption fully protects Bear Creek Bible Church and similarly situated religious organizations.

It is undisputed that those organizations have "a religious justification" for declining to employ individuals who violate their religious practices regarding marriage. *Curay-Cramer*, 450 F.3d at 142. Thus, they are hiring "individuals of a particular religion," and Title VII "shall not apply." 42 U.S.C. § 2000e-1(a). And that is so even if an affected employee would attempt to characterize such decisions as sex discrimination, rather than religious discrimination. *Miss. Coll.*, 626 F.2d at 484-86; *see also* Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368, 376 (2015) ("[T]here is no limitation that turns on the mere chance that the employee-plaintiff complains of religious discrimination as opposed to claiming under some other protected class such as sex.").

### C. *Bostock*

This understanding is further confirmed by *Bostock*, which supports a plain-text reading of the Title VII religious exemption in two ways.

*First*, *Bostock* mandates that Title VII be interpreted according to its "plain terms." 140 S. Ct. at 1743. *Bostock* was insistent on this point. Although the employers in *Bostock* argued that entertaining claims of sexual orientation and gender identity discrimination would violate congressional intent and have far-reaching consequences, *id.* at 1749-54, the Court found these "extratextual considerations" irrelevant. *Id.* at 1737. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest"—"the written word" prevails. *Id.* Thus, because the Court concluded that sexual orientation discrimination is "prohibited by Title VII's plain terms," that was "the end of the analysis." *Id.* at 1743 (internal quotation marks omitted).

The same is true here. The religious exemption's "plain terms" cover employment decisions based on the "observance" of religious tenets. *Id.*; 42 U.S.C. § 2000e(j). The

primary arguments against this conclusion are based on legislative history, *see Pacific Press*, 676 F.2d at 1276, or consequentialist reasoning about the allegedly undesirable "outcomes" a plain-text reading would permit, *Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *10 (W.D.N.C. Sept. 3, 2021). Under *Bostock*, however, these considerations are irrelevant—the court's "role is limited to applying the law's demands as faithfully as [it] can"; it is not "to make new legislation" based on an interpretation of legislative history or to "address unwanted consequences of" Congress's handiwork. *Bostock*, 140 S. Ct. at 1753.

*Second*, *Bostock* expressly lists Title VII's religious exemption as one of the "doctrines protecting religious liberty" available in "future cases" asserting sexual-orientation and transgender-status discrimination. 140 S. Ct. at 1754. This makes no sense unless the exemption empowers religious employers to consider an employee's observance and practice in making employment decisions.

Specifically, after reaching its holding that Title VII encompasses claims of discrimination on the basis of sexual orientation and transgender status, the *Bostock* Court expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution." 140 S. Ct. at 1753-54. The Court therefore listed three different "doctrines protecting religious liberty" available in "future cases" involving sexual orientation-discrimination claims—the ministerial exception, the Religious Freedom Restoration Act, and Title VII's "express statutory exception for religious organizations." *Id.* at 1754 (citing § 2000e-1(a)). But if the Title VII exemption were limited to claims of *religious* discrimination involving the employee's denominational affiliation, there would be no reason for *Bostock* to invoke it as relevant "in cases like ours"—namely, one of *sexual-orientation* and *transgender-status* discrimination. *Id.* at 1753. This is a further indication that the religious exemption bars *all* claims when a religious organization makes employment decisions based on religious observance and practice.

9

Nor is *Bostock* the only recent statement from the Justices recognizing the exemption's scope. In *Our Lady of Guadalupe School v. Morrissey-Berru*, Justices Sotomayor and Ginsburg dissented from the majority's application of the First Amendment's ministerial exception to "lay teachers" at a Catholic school, in the process invoking Title VII's religious exemptions as an alternative protection for religious schools in employment disputes. *See* 140 S. Ct. at 2072, 2075 (Sotomayor, J., dissenting). In describing the exemptions, the Justices didn't say their applicability turned on whether the plaintiff had characterized his claims as religious discrimination. Instead, Justice Sotomayor wrote that the exemptions "protect a religious entity's ability to make employment decisions—hiring or firing—*for religious reasons.*" *Id.* (Sotomayor, J., dissenting) (emphasis added); *see also* Tr. of Oral Arg. at 11-12, *Our Lady,* 140 S. Ct. 2049 (No. 19-267) (Breyer, J.) (similar).[4]

In short, *Bostock* and *Our Lady* confirm what the plain language of Title VII's religious exemptions already shows: that the exemptions apply when the religious employer's decision was based on the employee's religious "belief," "observance," or "practice," 42 U.S.C. § 2000e(j)—regardless of whether the plaintiff styles her claim as one of religious discrimination or not.

### D. EEOC's own guidance

EEOC's Compliance Manual on Religious Discrimination, published just this year, confirms this understanding. EEOC Compliance Manual, https://perma.cc/2YF5-33RN. The Manual states that Title VII's religious exemptions "allow a qualifying religious organization to assert as a defense to a Title VII claim of discrimination or retaliation that it made the challenged employment decision *on the basis of religion.*" *Id.* at § 12.C.1 (emphasis added). It then notes that "[t]he definition of 'religion' found

---

[4]   The majority did not dispute this understanding of Title VII's scope, but rather went further, holding that the First Amendment barred the claims at issue without regard to whether the schools had religious reasons for their actions. 140 S. Ct. at 2068.

in section 701(j)"—which includes observance and practice—"is applicable to the use of the term in [Title VII's religious exemptions]." *Id.* Thus, it concludes, "the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the employee, but broadly by the employer's religious observances, practices, and beliefs." *Id.*

## II. Constitutional avoidance requires a plain-language interpretation of Title VII's religious exemption.

Failing to interpret the religious exemption according to its plain terms would present "serious constitutional questions." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 501 (1979). Plaintiffs have already briefed the serious constitutional questions raised under the Free Exercise Clause and freedom of expressive association. Dkt. 90 at 11-13, 13-14. However, forcing religious organizations to employ individuals who reject their religious practices also violates another key constitutional protection: the protection of religious autonomy. Religious autonomy is secured by both Religion Clauses and protects the right of religious organizations to employ only those who are faithful to their doctrinal practices. Thus, the principle of constitutional avoidance requires the Court to interpret Title VII to avoid a violation of religious autonomy. *Catholic Bishop*, 440 U.S. at 501; *see also Whole Woman's Health v. Smith*, 896 F.3d 362, 370-74 (5th Cir. 2018) (applying constitutional-avoidance doctrine to religious-autonomy question, because "the importance of securing religious groups' institutional autonomy … cannot be understated[.]").

### A. Religious autonomy

The constitutional principle of religious autonomy gives "'special solicitude to the rights of religious organizations' *as* religious organizations, respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." *Korte v. Sebelius*, 735 F.3d 654, 677-79 (7th Cir. 2013) (quoting *Hosanna-Tabor*, 565 U.S. at

11

189).[5] One aspect of religious autonomy is the "ministerial exception," which protects the right to make employment decisions respecting "ministers" for any "reason"— "religious" or otherwise. *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 174 (5th Cir. 2012); *see also id.* at 171 n.1.

But the ministerial exception is only one "component" of the broader doctrine of religious "autonomy." *Our Lady*, 140 S. Ct. at 2060. That doctrine also protects other "personnel decision[s]"—including for *non*-ministers—when they are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002). Determining that "only those committed to [the church's] mission should conduct" its activities is a "means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). Thus, "matter[s] which concern[ ] … the conformity of the members of the church to the standard of morals required of them" are matters "strictly and purely ecclesiastical in its character, … over which the civil courts exercise no jurisdiction." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871).

*Bryce* is instructive. There a church's youth minister sued under Title VII after she was allegedly harassed following her same-sex civil commitment ceremony; she alleged that church officials' statements about homosexuality and her activities constituted sex discrimination. 289 F.3d at 651-53. But the Tenth Circuit affirmed judgment for the church on grounds of religious autonomy. The court expressly declined to decide whether the plaintiff was a "minister" for ministerial-exception purposes. *Id.* at 658 n.2. Instead, the court explained that even where the plaintiff is *not* a min-

---

[5]   Courts have variously used the terms "religious autonomy" and "church autonomy" to denote this concept. *See, e.g., Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring) (describing "religious autonomy"). We use "religious autonomy" here to clarify that the concept extends beyond houses of worship to "other religious institutions" as well. *Our Lady*, 140 S. Ct. at 2060.

ister, claims challenging religious organizations' "personnel decision[s]" are precluded where "the alleged misconduct is 'rooted in religious belief.'" *Id.* at 657-58 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Thus, because the plaintiff had suffered adverse action for "violating Episcopal doctrine"—specifically, entering a same-sex union—and the challenged conduct consisted of "meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts [could] not intervene." *Id.* at 652, 660.

Other courts have repeatedly applied a similar analysis, holding that the "overarching principle of religious autonomy" barred employment-discrimination claims arising from a religious organization's interpretation and application of religious doctrine, regardless of whether the plaintiff is a minister or not. *See Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871 (N.D. Ill. 2019) (citing *Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772, 782, 785 (N.D. Ill. 2018), *aff'd in part and rev'd in part on other grounds*, 3 F.4th 968 (7th Cir. 2021)).

In *Demkovich*, for example, the court held that religious autonomy, rather than the ministerial exception, barred a Catholic church employee's hostile-work-environment claim based on the pastor's alleged "abusive and harassing behavior" in response to the employee's sexual orientation and same-sex wedding. 343 F. Supp. 3d at 776. Some of the alleged comments were deplorable. *See id.* at 776-77. Yet the court nonetheless dismissed the claim on the pleadings, because "the Archdiocese offer[ed] a religious justification for the alleged derogatory remarks and other harassment": "the pastor's opposition, in accord with Catholic doctrine, to same sex marriage." *Id.* at 786 (internal quotation marks omitted). Because the employee's claim implicated that "official opposition," entertaining it "would pose too much of an intrusion into the religious employer's Free Exercise and Establishment Clause rights." *Id.* at 785-86.

13

Likewise, in *Moody Bible*, the court dismissed employment-discrimination claims involving a religious employer's application of its religious standards. There, a Christian college dismissed a teacher because her beliefs and advocacy in favor of "women in the ministry" were "contrary to [the college's] doctrinal views" on "gender roles." 412 F. Supp. 3d at 865, 872. The teacher then sued, alleging that the firing constituted sex discrimination and retaliation in violation of Title VII. *Id.* at 871-72. The court could not "conclusively" determine whether plaintiff was a minister based solely on the complaint. *Id.* at 871. But it nonetheless dismissed her claims as violating religious autonomy, reasoning that when a religious employer's reasons for taking adverse action are "rooted firmly in its religious beliefs," entertaining discrimination claims "would impermissibly inject the auspices of government into religious doctrine and governance." *Id.* at 871-72 (citing *Bryce*, 289 F.3d at 657-59); *see also Aparicio v. Christian Union, Inc.*, No. 18-cv-0592, 2019 WL 1437618, at *8-10 (S.D.N.Y. Mar. 29, 2019) (barring non-minister plaintiff's Title VII discrimination and retaliation claims as violating religious autonomy where the plaintiff was fired for opposing the religious organization's beliefs excluding women from ministry).

Here, as in *Bryce*, *Demkovich*, and *Moody Bible*, claims that a religious organization has "discriminated" by requiring its employees to follow its religious practices are barred by religious autonomy. Allowing such claims to proceed "would impermissibly inject the auspices of government into religious doctrine and governance." *Moody Bible*, 412 F. Supp. 3d at 871-72 (citing *Bryce*, 289 F.3d at 657-59). Thus, when a religious organization "makes a personnel decision based on religious doctrine, … the courts will not intervene." *Bryce*, 289 F.3d at 660.

Such claims are also barred for another reason: because they invite courts to "sit[] in … judgment of" a religious organization's beliefs, thus entangling courts in religious questions. *Cannata*, 700 F.3d at 179 (quoting *Hosanna-Tabor*, 565 U.S. at 206

14

(Alito, J., concurring)). "[F]ederal courts are not empowered to decide (or to allow juries to decide) religious questions." *McCarthy v. Fuller*, 714 F.3d 971, 980 (7th Cir. 2013). Rather, "the mere adjudication of such questions would pose grave problems for religious autonomy." *Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., concurring).

However, allowing employees to sue their employers over religious standards of conduct would routinely entangle courts in quintessentially theological disputes. Take, for example, a case where an employee (or prospective employee) has entered a same-sex marriage in violation of the religious employer's teachings. In such a case, there is no dispute that the employee has violated the employer's teachings. Instead, the employee typically seeks to make out a claim of discrimination by showing that *other* employees violated *other* church teachings—such as engaging in heterosexual sex outside of marriage or committing other sins—and were not terminated. But such a comparison is probative only if engaging in heterosexual sex outside of marriage or committing other sins is, as a moral and theological matter, an equally weighty violation as being in a same-sex marriage. This is a theological question not amenable to resolution by civil courts.

Multiple cases demonstrate the point. For example, in *Curay-Cramer*, a Catholic school teacher fired for publicly supporting abortion attempted to prove sex discrimination by showing that her conduct was "less egregious under Catholic doctrine than conduct of male employees who were treated less harshly." 450 F.3d at 132. The Third Circuit rejected the claim, because "measur[ing] the degree of severity of various violations of Church doctrine" "would violate the First Amendment." *Id.* at 137, 139.

Likewise, in *Hall v. Baptist Memorial Health Care Corp.*, a Baptist college employee was fired for becoming a lay minister in a church that affirmed homosexual conduct; she tried to prove discrimination by pointing to other employees who had not been fired for violating other Baptist teachings—such as becoming ordained in a church that permitted women's ordination, or "having an adulterous relationship."

15

215 F.3d 618, 626-27 (6th Cir. 2000). But the Sixth Circuit declined to entertain this comparison and affirmed judgment for the college. "In essence," the court explained, the plaintiff was "requesting this court to tell the College that it must be opposed to the ordination of women with the same degree of conviction and intensity" as it opposed homosexuality or else "suffer liability under Title VII." *Id.* at 626 (internal quotation marks and brackets omitted). Accepting that invitation would violate the First Amendment. *Id.*

The same is true here. Allowing claims of sexual-orientation or gender-identity discrimination against religious organizations, when those organizations have a sincere religious reason for the employment action, would unduly entangle courts in religious questions. Plaintiff employees would allege that they have been treated worse than other employees who violated other church teachings. And those allegations would require courts to resolve a religious question—namely, whether those other church teachings are morally and theologically equivalent. *See Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 410 (5th Cir. 2016) ("In order for a Title VII plaintiff to establish his prima facie case through the use of a similarly situated comparator, he must establish that the comparator was treated more favorably than the plaintiff under nearly identical circumstances." (internal quotation marks omitted)). In short, if a religious organization "wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability." *Hall*, 215 F.3d at 626-27.

### B. Constitutional avoidance

Under the doctrine of constitutional avoidance, this Court must construe Title VII's religious exemption broadly to avoid reaching these serious constitutional questions. The leading case is *Catholic Bishop*. There, the Court considered whether the National Labor Relations Act gave the NLRB jurisdiction over lay faculty members

16

at Catholic schools. 440 U.S. at 491. Noting that the Religion Clauses could be violated by "the very process of inquiry" necessary to resolve labor charges against religious schools, the Court concluded that "serious First Amendment questions" would follow from finding jurisdiction. *Id.* at 502, 504. Thus, the Court held that the statute should be interpreted narrowly to avoid that result unless there was "clear expression of an affirmative intention of Congress" to require it. *Id.* at 504; *see also id.* at 504-07 (finding none); *Whole Woman's Health*, 896 F.3d at 373-75 (applying constitutional avoidance to bar discovery where permitting it would "interfere[] with" a religious organization's "decision-making processes on a matter of intense doctrinal concern").

*Curay-Cramer* is also instructive. Again, there, the Third Circuit held that Title VII's religious exemption barred a sex-discrimination claim asserted by a Catholic-school teacher dismissed for promoting abortion. In doing so, the court invoked constitutional avoidance. First, the court explained that adjudicating the claim would require "assess[ing] the relative severity of offenses"—an "exercise" that would not only give rise to serious constitutional questions but "would violate the First Amendment." 450 F.3d at 139. And second, Congress had not "manifested an intent to have Title VII apply … in this context," since, "[e]ven assuming" the claim were "not expressly barred by" the religious exemption, "the existence of that provision and our interpretation of its scope" at least "prevent us from finding a clear expression of an affirmative intention on the part of Congress to have Title VII apply." *Id.* at 140-41.

Here, applying Title VII to require religious organizations to retain employees who reject church teaching on human sexuality would, at minimum, give rise to serious constitutional questions under the First Amendment's protection of religious autonomy. *Curay-Cramer*, 450 F.3d at 140. So Title VII must be read narrowly to avoid that result absent a clearly expressed, affirmative intention of Congress to the contrary. *Catholic Bishop*, 440 U.S. at 501. There is no such intention; rather, as explained above, the statute exempts religious employers from claims like these. Thus,

17

constitutional avoidance, as well as the plain text of Title VII, requires that religious employers be permitted to make employment decisions based on an individual's religious observance and practice.

## CONCLUSION

To the extent it reaches the question, the Court should hold that Title VII's religious exemption permits religious employers to make employment decisions based on an employee's religious observance and practice.

Respectfully submitted.

/s/ Luke W. Goodrich
Luke W. Goodrich
Bar No. 977736DC
Joseph C. Davis
Bar No. 1047629DC
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
Phone: (202) 955-0095
Fax: (202) 955-0090
lgoodrich@becketlaw.org

*Attorneys for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2021, the foregoing brief *amicus curiae* was served on all parties via ECF.

/s/ Luke W. Goodrich
Luke W. Goodrich
