## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **BEAR CREEK BIBLE CHURCH & BRAIDWOOD MANAGEMENT, INC.,** *individually and on behalf of those similarly situated,* | § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Civil Action No. 4:18-cv-00824-O** |
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al.,** | § § § § | |
| **Defendants.** | § § | |

## MEMORANDUM OPINION AND ORDER

In this declaratory judgment class action lawsuit, a Christian church and a Christian-owned business seek to protect their ability to require their employees to live by the teachings of the Bible on matters of sexuality and gender. They, individually and on behalf of those similarly situated, seek religious exemption from, and a declaration that they do not violate, the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964 so they may hire and fire in accordance with sincerely held religious beliefs and employment policies.[1]

For the following reasons, Defendants' Motion for Summary Judgment (ECF No. 95) based on standing, ripeness, and sovereign immunity is **DENIED**. Plaintiffs' Motion to Certify Classes (ECF No. 71) is **GRANTED** in part and **DENIED** in part. As set out below, the Court

---

[1] Defendants object to Plaintiffs' refusal to use the term "LGBTQ" to describe the individuals they will not hire or retain. Defs.' Summ. J. Br. 8 n.1, ECF No. 96. Plaintiffs argue that "[i]t is crucial to maintain the distinction between an individual's orientation (or identity) and the individual's behavior, and the 'LGBTQ' moniker does not do that." Pls.' Summ. J. Br. 6, ECF No. 101 (footnote omitted). For example, Plaintiffs say they are willing to hire homosexual employees who are celibate and who are not in same-sex relationships. The Court refers to the individuals at issue based on behavior, not identity, because to do otherwise misconstrues Plaintiffs' contentions.

certifies a Religious Business-Type Employers Class on all claims of Braidwood Management Inc. ("Braidwood") and certifies an All Opposing Employers Class on Claims 4 and 5. Finally, the parties' Motions for Summary Judgment (ECF No. 72; ECF No. 95) are **GRANTED** in part and **DENIED** in part.[2] Because Bear Creek Bible Church ("Bear Creek Church") and the Church-Type Employers Class are not burdened by Title VII, Plaintiffs' Motion for Summary Judgment is **DENIED** in part as to this class. Plaintiffs' Motion for Summary Judgment for the Religious Business-Type Employers Class is **GRANTED** in that those in that class are protected by the Religious Freedom Restoration Act and the First Amendment. The Court finds that the policies of both the All Opposing and Religious Business-Type Classes regarding sexual conduct, dress codes, and restrooms do not violate Title VII as a matter of law. However, Plaintiffs' Motion is **DENIED** and Defendants' is **GRANTED** as to employer policies concerning bisexual conduct, sex-reassignment surgery, and hormone treatment.

## I.    BACKGROUND[3]

In 2020, the Supreme Court held that Title VII's sex discrimination prohibition forbids employers from firing employees based on homosexuality or transgender status, because to do so is a form of discrimination based on sex. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020). The *Bostock* Court expressly left open the implications for religious liberties and other matters arising from its decision. *See id.* at 1754. Plaintiffs present those questions here and seek

---

[2] Before the Court are Plaintiffs' Motion to Certify Class (ECF No. 71), filed May 24, 2021; Defendants' Response in Opposition to Class Certification (ECF No. 82), filed June 7, 2021; Plaintiffs' Reply (ECF No. 92), filed June 23, 2021; Plaintiffs' Motion for Summary Judgment (ECF No. 72), filed May 24, 2021; Plaintiffs' Amended Brief in Support of Summary Judgment (ECF No. 90), filed June 21, 2021; Defendants' Consolidated Response and Motion for Summary Judgment (ECF Nos. 94–96), filed June 28, 2021; Plaintiffs' Consolidated Response and Reply (ECF No. 101), filed July 13, 2021; and Defendants' Reply (ECF No. 104), filed July 16, 2021.

[3] Unless otherwise noted, the facts are taken from Plaintiffs' Amended Complaint (ECF No. 86) and the stipulated facts (ECF No. 69).

a declaration that they, and others similarly situated, are permitted to refrain from employing those who engage in conduct that violates their sincerely held religious beliefs and First Amendment protections. Plaintiffs also seek a declaration that *Bostock* does not prohibit sex-neutral codes of conduct.

### A. Procedural History

Plaintiffs initially sued the Equal Employment Opportunity Commission ("EEOC"), seeking declarations that (1) the First Amendment and the Religious Freedom Restoration Act ("RFRA") give Plaintiffs the right to operate their churches and businesses in accordance with their sincerely held religious beliefs that homosexual behavior is immoral, and (2) any federal statute, executive order, or agency rule, policy, or regulatory guidance that infringes or burdens that right is unenforceable. Compl., ECF No. 1. The Court stayed the proceedings pending resolution of *Bostock*. ECF No. 38.

In response to *Bostock*, Plaintiffs amended their complaint to reassert their claims for declaratory judgment seeking religious exemption from Title VII. The Amended Complaint asserts five claims for declaratory judgment: (1) The Religious Freedom Restoration Act Compels Exemptions To *Bostock*'s Interpretation Of Title VII; (2) The Free-Exercise Clause Compels Exemptions To *Bostock*'s Interpretation Of Title VII; (3) The First Amendment Right Of Expressive Association Compels Exemptions To *Bostock*'s Interpretation Of Title VII; (4) Title VII, As Interpreted In *Bostock*, Does Not Prohibit Discrimination Against Bisexual Employees; and (5) Title VII, As Interpreted In *Bostock*, Does Not Prohibit Employers From Establishing Sex-Neutral Rules Of Conduct That Exclude Practicing Homosexuals And Transgender People. Defendants moved to dismiss Plaintiffs' Amended Complaint. Mot. Dismiss, ECF No. 49. The Court denied the motion to dismiss for lack of jurisdiction in part and granted the motion in part.

ECF No. 56. The Court held that Plaintiffs have Article III standing to pursue this litigation but that any cause of action against the Attorney General was too speculative.[4] Plaintiffs then filed a motion to certify a class (ECF No. 71) and a motion for summary judgment (ECF No. 72). Defendants also filed a motion for summary judgment (ECF No. 95). All motions are now ripe for the Court's review.

### B.  Plaintiff Bear Creek Bible Church

Bear Creek Church is a nondenominational church located in Keller, Texas. Bear Creek Church requires its employees to live according to Biblical teachings on matters of sexuality and gender. In accordance with those teachings,[5] Bear Creek Church does not recognize same-sex marriage. Any church employee who enters into a same-sex marriage will not receive benefits for his or her same-sex partner and faces immediate dismissal. Bear Creek Church also requires its employees to use the restroom designated for their biological sex. Therefore, Bear Creek Church does not consider the following individuals for any ministerial and non-ministerial employment: practicing homosexuals, bisexuals, crossdressers, and transgender or gender non-conforming individuals. Bear Creek Church has at least fifteen employees, so it is subject to the requirements of Title VII. Some of these employees are non-ministerial employees such as secretaries and custodians.

Bear Creek Church asserts that there have been at least three instances in which it employed someone who was engaged in "sexually immoral behavior, including homosexuality" or "gender

---

[4] Plaintiffs amended their complaint to reassert claims against the current Attorney General, Merrick Garland. For the reasons stated in the Court's previous order (ECF No. 56), Plaintiffs do not have standing to sue the Attorney General at this phase in the litigation. Therefore, all claims against Merrick Garland in his official capacity are dismissed without prejudice for lack of standing.

[5] Specifically, Bear Creek Church believes that "marriage is exclusively the union of one genetic male and one genetic female." *See* Am. Compl. 8, ECF No. 86. (citing Genesis 2:24; Matthew 19:5–6, Mark 10:6–9; Romans 1:26–27; I Corinthians 6–9).

non-conforming behavior including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex." Salveson Decl. 1, ECF No. 90-4. "The first of these individuals was a homosexual pedophile who left church employment in 1996. He was caught molesting children at the church that he worked at after leaving Bear Creek, and is now serving time in state prison." *Id.* at 2. "The second of these individuals left church employment in 2007, after he had been discharged for poor performance. [Bear Creek Church] learned that this individual was a homosexual because he married another man after leaving church employment." *Id.* Bear Creek Church also "had an employee on administrative staff who was engaged in cross-dressing behavior, but he voluntarily left employment." *Id.* Bear Creek Church does not "believe it is appropriate for these former employees, or other individuals that are struggling with homosexual conduct or gender non-conforming behavior, to be working as employees of the church." *Id.*

### C. Plaintiff Braidwood Management, Inc.

Braidwood employs approximately seventy individuals, who work at one of the following three businesses, each of which is owned or controlled by Dr. Stephen Hotze: the Hotze Health & Wellness Center, Hotze Vitamins, and Physicians Preference Pharmacy International LLC. Because Hotze operates these entities as Christian businesses, he does not allow Braidwood to employ individuals who are engaged in homosexual behavior or gender non-conforming conduct of any sort. Hotze Decl. 1, ECF No. 90-5. Hotze does not allow Braidwood to recognize same-sex marriage or extend benefits to an employee's same-sex partner, because he believes that would lend approval to homosexual behavior and make him complicit in sin, violating his sincerely held religious beliefs. *Id.*

Hotze also will not allow Braidwood to recognize same-sex marriage in part because the law of Texas continues to define marriage as the union of one man and one woman. Hotze believes Texas law continues to prohibit private employers such as Braidwood from recognizing same-sex marriage.[6] Hotze does not permit employees of Braidwood to use a restroom designated for members of the opposite biological sex—regardless of the gender identity the employee asserts. *Id.*

Braidwood also enforces a sex-specific dress-and-grooming code that requires men and women to wear professional attire according to their biologically assigned sex. Hotze Decl. 1, ECF No. 90-5. Men are forbidden to wear earrings, but women may. Men who have customer contact must wear a tie; women are not permitted to wear ties. *Id.* Women can wear skirts, blouses, shoes with heels, and fingernail polish, while men are forbidden to wear any of these items. *Id.* Cross-dressing of any sort is strictly prohibited. *Id.* Hotze enforces this sex-specific dress-and-grooming code to maintain the professionalism of his businesses and to carry out his belief that the Bible requires men to dress as men and women to dress as women. *See* Am. Compl. 11, ECF No. 86 (citing Deuteronomy 22:5 (KJV) ("A woman shall not wear anything that pertains to a man, nor shall a man put on a woman's garment, for all who do so are an abomination to the LORD your God.")).

Braidwood provides health insurance to its employees as a self-insured entity. Because Braidwood has more than fifty employees, it must offer Affordable Care Act–compliant health insurance or face financial penalties. *See* 26 U.S.C. § 4980H(c)(2). Braidwood's self-insured health plan is administered by a company called Entrust. On December 20, 2018, Entrust issued a new Employee Benefit Plan Document for Braidwood's health plan, which describes changes to

---

[6] *See* Tex. Const. art. I, § 32 ("Marriage in this state shall consist only of the union of one man and one woman."); Tex. Fam. Code § 6.204(b) ("A marriage between persons of the same sex or a civil union is contrary to the public policy of this state and is void in this state."). Texas has not repealed or amended these laws in response to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

the plan that took effect on December 1, 2018. *See* Am. Compl. Ex. 5, ECF No. 86-5. In this document, Entrust redefined the term "spouse" to include individuals in same-sex marriages. Entrust made this change without Hotze's knowledge or approval. On February 14, 2019, Hotze wrote a letter to Entrust stating,

> I am unwilling to allow Braidwood's plan to recognize same-sex marriage. Braidwood is a Christian business and I operate all of my businesses according to Christian beliefs and teaching. I cannot allow Braidwood's plan to define marriage in a manner that contradicts my religious beliefs or Christian teaching on marriage and sexuality.
>
> I therefore respectfully ask you to amend the definition of "spouse" to include only marriages between one man and one woman.
>
> If you believe that the law prohibits Entrust from amending Braidwood's plan in this manner, please write back to me and let me know. I do not want Entrust to violate the law, and if you believe that the law prevents you from accommodating this request then I will seek declaratory relief in court against the relevant government officials.

*See* Am. Compl. Ex. 6, ECF No. 86-6.

> On February 22, 2019, Entrust wrote back to Hotze:
>
> [W]e firmly believe that our current definition of "spouse" in the [Employee Benefit Plan Document] is in line with the clear law of the United States. However, we completely understand that you feel differently due to religious convictions and personal beliefs, which we obviously respect. As the Plan Sponsor of the Braidwood Employee Benefit Plan Trust, you control the terms of your plan. If you feel that you need to take legal action on this issue, that is completely up to you as the Trustee. We respect your decision to do so, but we cannot influence your decision one way or another on pursuing same.

*See* Am. Compl. Ex. 7, ECF No. 86-7.

### D.  Named Defendants

The remaining defendants are the EEOC, which is charged with enforcing Title VII of the Civil Rights Act of 1964, and EEOC Commissioners Charlotte A. Burrows, Jocelyn Samuels, Janet Dhillon, Keith E. Sonderling, and Andrea R. Lucas.

7

### E.  Title VII and EEOC Guidance

Title VII of the Civil Rights Act of 1964 forbids employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2). The EEOC has interpreted these statutory prohibitions on "sex" discrimination to include discrimination on account of sexual orientation or gender identity. *See Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *11 (July 16, 2015) (sexual orientation); *Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *11 (Apr. 20, 2012) (gender identity).

The EEOC issued a guidance document directing employers to recognize same-sex marriage on the same terms as opposite-sex marriage. *See* U.S. Equal Emp. Opportunity Comm'n, *Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or Transgender Workers* (Apr. 29, 2014)[7] ("Examples of sex discrimination involving sexual orientation include . . . denying spousal health insurance benefits to a female employee because her legal spouse is a woman, while providing spousal health insurance to a male employee whose legal spouse is a woman."). The EEOC also requires that employers allow employees into restrooms that correspond to the employees' gender identity, no matter the individual's biological sex, whether the individual has had a sex-change operation, or whether other employees have raised objections or privacy concerns. *See Preventing Employment Discrimination Against Lesbian, Gay, Bisexual or*

---

[7]     https://www.eeoc.gov/laws/guidance/preventing-employment-discrimination-against-lesbian-gay-bisexual-or-transgender.

*Transgender Workers*, *supra* (citing *Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015)) ("Title VII is violated where an employer denies an employee equal access to a common restroom corresponding to the employee's gender identity.").

The Supreme Court has recognized a "ministerial exception" implicit in the First Amendment that categorically exempts a religious group's selection of its ministers from the reach of anti-discrimination law. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). That exception does not protect churches (such as Bear Creek Church) and religious schools as to *non-ministerial* employees, nor does it protect Christian-owned businesses (such as Braidwood). The EEOC has taken enforcement action against Christian-owned businesses (such as Braidwood) who do not conform to its employment practices. *See, e.g.*, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) (EEOC lawsuit against a Christian funeral home for prohibiting a biological male employee from dressing in accordance with the claimed female gender identity), *aff'd sub nom. Bostock*, 140 S. Ct. 1731.

### 1. Title VII Exemption

Regardless of its employees' ministerial or non-ministerial status, an employer may be exempt from Title VII entirely if it qualifies as a "religious" employer. The text of Title VII's religious accommodation provides:

> "[Title VII] shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

42 U.S.C. § 2000e-1(a). Courts do not agree on the scope of this exemption or on the entities it covers. *Compare Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (adopting a narrow "co-religionist preference" interpretation) ("This provision does not, however, exempt religious educational institutions with respect to all discrimination. It merely

indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination."), *with EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (holding the religious-employer exemption could be invoked as a defense to a sex discrimination claim).

To consider how Title VII apples in this case, this Court begins with the text of the statute. The text of the exemption does not provide religious employers a blanket exemption to Title VII's prohibitions. *See* Br. of Becket Fund for Religious Liberty as Amicus Curiae Supp. Pls. 4, ECF No. 114; Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 302 (2016). If it did, the text would simply say it does not apply to religious employers. *Id.* Instead, it exempts those religious employers who hire employees to perform work connected with the carrying on of its activities or mission. *Id.*

Importantly, the Title VII exemption defines the term "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e. "When a statute includes an explicit definition, we must follow that definition . . . ." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (internal quotation marks and citation omitted). Read plainly then, Title VII does not apply to religious employers when they employ individuals based on religious observance, practice, or belief. *See* Phillips, *supra* at 303; *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) ("[Section] 702 is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions."); *Larsen v. Kirkham*, 499 F. Supp. 960, 966 (D. Utah 1980) ("[I]t is inconceivable that the exemptions would purport to free religious schools to employ those who best promote their religious mission, yet

shackle them to a legislative determination that all nominal members are equally suited to the task."), *aff'd*, No. 80-2152, 1982 WL 20024 (10th Cir. 1982).

The plain text of this exemption, therefore, is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief. *See* 42 U.S.C. § 2000e-1(a) ("[Title VII] shall not apply to" . . . a religious organization). In other words, Title VII's prohibition "shall not apply" to religious employers who desire to "employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991). Thus, a religious employer is not liable under Title VII when it refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief.

In addition to the plain reading of this provision, the structure of the Title VII religious exemption supports this interpretation. The religious exemption in § 2000e-1(a) does not stand alone. A second exemption covers those with "alien" employees: "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State . . ." 42 U.S.C. § 2000e-1(a). Title VII provides no limitation to the alien exemption. Accordingly, "[i]f the religious exemption were somehow limited only to certain types of Title VII claims (i.e., of religious discrimination), one would expect the alien exemption to have a parallel limitation (i.e., claims of race or national-origin discrimination)." Br. of Becket Fund for Religious Liberty as Amicus Curiae Supp. Pls. 4; ECF No. 14. Without such limitations, the exemption for religious employers must be read equally broadly.

That leaves the question of which organizations qualify as "religious" under the exemption.[8] The statute does not define "religious corporation, association, educational institution, or society." 42 U.S.C. § 2000e-1(a). In the absence of a statutory definition, the circuit courts have developed a multifactor test to determine whether an employer is "religious" for the purpose of the Title VII exemption. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (citing *Killinger v. Samford Univ.*, 113 F.3d 196 (11th Cir. 1997); *EEOC v. Kamehameha Schs./Bishop Est.*, 990 F.2d 458 (9th Cir. 1993); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988); *EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980)). At least ten courts, including one district court[9] in the Fifth Circuit, have adopted the following factors:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon*, 503 F.3d at 226. The *LeBoon* court noted that "not all [of these] factors will be relevant in all cases, and the weight given each factor may vary from case to case." *Id.* at 227.

---

[8] The "religious employer" designation with respect to the Title VII exemption is not to be confused with the aforementioned "Religious Employer" class Plaintiffs seek to certify. Although an organization might be religious for purposes of joining the class, it may not be a "religious employer" under the narrower Title VII exemption analysis.

[9] *See Scaffidi v. New Orleans Mission, Inc.*, No. CV 18-4113, 2020 WL 1531266, at *4 (E.D. La. Mar. 31, 2020) ("In the absence of guidance from the Fifth Circuit, the factors in *LeBoon v. Lancaster Jewish Community Center*, provide some guidance for determining whether an institution is a religious organization within the meaning of Title VII.").

## II.     LEGAL STANDARDS

### A.  Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). The party seeking class certification "bear[s] the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). "The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). A district court must "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination'" of the certification issues. *Stukenberg*, 675 F.3d at 837 (internal quotation marks and citation omitted).

The Court also "has discretion to modify [a party's] proposed class and subclass to form workable class definitions." *Jones v. Realpage, Inc.*, No. 3:19-cv-2087, 2021 WL 852218 (N.D. Tex. 2021) (cleaned up) (citing *In re Monumental Life Ins.*, 365 F.3d 408, 414 & n.7 (5th Cir. 2004)). "This discretion extends to creating subclasses, as well as to modifying an approved class." William B. Rubenstein, *Newberg on Class Actions* § 7:27 (5th ed. 2021) (footnote omitted). The Fifth Circuit provides broad discretion to district courts, permitting them "to limit or modify class definitions to provide the necessary precision." *Monumental Life Ins.*, 365 F.3d at 414(citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly.")).

Federal Rule of Civil Procedure 23 governs whether a proposed class falls within this limited exception. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).  Rule 23(a)'s four threshold requirements are

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four threshold conditions are "commonly known as 'numerosity, commonality, typicality, and adequacy of representation.'" *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (citations omitted). Additionally, the Fifth Circuit has articulated an "ascertainability" doctrine implicit in Rule 23. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."). "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).

In addition, a plaintiff seeking certification must also satisfy at least one of the grounds identified in Rule 23(b). Fed. R. Civ. P. 23(b). Rule 23(b)(2) applies where the four threshold requirements are met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This requirement is satisfied "when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal–Mart*, 564 U.S. at 360.

### B. Summary Judgment

Summary judgment should be granted where the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not "a disfavored procedural shortcut," but rather an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See Celotex*, 477 U.S. at 323. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Anderson*, 477 U.S. at 250. "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991). Questions of statutory interpretation are questions of law. *Khanh Nhat Thuy Le v. Holder*, 732 F.3d 425, 427 (5th Cir. 2013).

### III.    ANALYSIS

#### A.  Defendants' Motion for Summary Judgment

Defendants move for judgment as a matter of law arguing that (1) Plaintiffs have failed to demonstrate standing; (2) Plaintiffs have failed to demonstrate ripeness; (3) and the United States has not waived sovereign immunity as to Claims 2–5. Defs.' Summ. J. Br. 2, ECF No. 96.[10] The Court addressed standing and ripeness in a previous order (ECF No. 56) but is under a continuing duty to ensure it has jurisdiction. Because standing and ripeness must exist before resolving any other issue, the Court addresses those first. For the reasons that follow, Plaintiffs have standing, Plaintiffs' claims are ripe, and the United States has waived sovereign immunity. Therefore, Defendants' Motion for Summary Judgment on these grounds must be **DENIED.**

#### 1.  Standing

The Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing lies at the heart of Article III's case-or-controversy requirement. "Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Id.* (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).

The Supreme Court has established that the "irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an

---

[10] Defendants also move for summary judgment on substantive grounds, including that they have not violated any of Plaintiffs' religious rights and that *Bostock* prohibits each of the sex-neutral policies for which Plaintiffs seek declarations. Those grounds will be addressed in turn along with Plaintiffs' Motion for Summary Judgment. *See* discussion *infra* Section III.C. As set out below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant . . . ." *Id.* at 560 (cleaned up) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon*, 426 U.S. at 38, 43). In order "to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003.).

Because this is a pre-enforcement action, Plaintiffs must establish a "credible fear" of enforcement to establish Article III standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (holding that a plaintiff with a credible fear of enforcement of a statute has standing).[11] Defendants assert that Plaintiffs have not presented evidence that Plaintiffs *themselves* are at imminent risk of an enforcement action. Defs. Summ. J. Br. 13–18, ECF No. 96. Of course, a plaintiff need not show a specific threat of enforcement directed at him personally before seeking declaratory relief. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (allowing abortion providers to challenge a state abortion statute "despite the fact that the

---

[11] During oral argument in this case, Defendants affirmed that they have not disclaimed their ability or willingness to bring enforcement actions against Plaintiffs or those similarly situated. *See* Takemoto, Transcript 33, ECF No. 109 ("I think the United States would disagree if there was a statement from the government that the case was moot because the government would not enforce a particular law against someone."); Mitchell, Transcript 66, ECF No. 109 ("They have not renounced their intention to bring future enforcement actions against other religious employers.").

record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes"). Indeed, the entire point of a pre-enforcement challenge is to allow courts to rule on the legality of a plaintiff's conduct *before* an enforcement action is brought. *See Steffel*, 415 U.S. at 459.

Defendants argue that Plaintiffs need to show that they are "in a position" to violate the law. Takemoto, Transcript 23, ECF No. 109; *See also* Defs.' Summ. J. Br. 15, ECF No. 96; *Nat'l Fed'n of the Blind v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (holding that plaintiffs did not have standing for a pre-enforcement challenge because they did not stand in a position ready to violate the law). They state, "the Supreme Court has repeatedly and recently admonished, including in [the *California v. Texas*] decision this past term, 'Courts should be wary of declaratory judgment requests under these circumstances.'" Takemoto, Transcript 24, ECF No. 109. The Supreme Court in *California v. Texas* held the plaintiffs had no standing to challenge the Affordable Care Act because after Congress removed the penalty, the federal government had no enforcement mechanism under the law. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (Plaintiffs "have not shown that any kind of Government action or conduct has caused or will cause the injury they attribute to [the statute].").

Here, the EEOC has an enforcement mechanism. Further, it has shown that it is willing and able to enforce its understanding of *Bostock* against religious employers. Plaintiffs argue that the recent EEOC enforcement action against Harris Funeral Homes serves, in part, as the basis for their credible fear of enforcement. Pls.' Summ. J. Br. 11–13, ECF No. 101.

*Harris Funeral Homes* involved a male-to-female transgender employee seeking to dress as a woman in violation of the dress code. *Harris Funeral Homes*, 884 F.3d at 567. The employer prohibited the employee from dressing in accordance with the employee's professed gender

identity because to do so would distract grieving friends and family during the funerals. *Id.* at 568–69. As a result, the employer fired the employee, who then filed a charge of discrimination with the EEOC. *Id.* After an investigation, the EEOC brought an enforcement action against Harris Funeral Homes. *Id.* at 569. Harris Funeral Homes asserted that gender identity was not protected by Title VII and therefore the employee had no claim. *Id.* at 569–70. The Sixth Circuit disagreed and held that gender identity was covered by Title VII. *Id.* at 600. Addressing Harris Funeral Homes' RFRA defense, the Sixth Circuit concluded it was not substantially burdened by Title VII because the employer could simply allow its employees to dress how they want. *Id.* at 583–90. *Harris Funeral Homes* was consolidated with *Bostock* at the Supreme Court. In June 2020, the Supreme Court held in *Bostock* that when an employer discriminates on the basis of gender identity or homosexuality, it violates Title VII's prohibition against discrimination based on an employee's sex. *See Bostock*, 140 S. Ct. at 1753.

Plaintiffs also point to EEOC Guidance documents that, in their view, overstate the *Bostock* holding, and they fear that the EEOC will enforce this view of *Bostock*. The EEOC has consistently—before and after *Bostock*—taken the position that Title VII protects against discrimination based on gender identity and sexual orientation. *See* U.S. Equal Emp. Opportunity Comm'n, *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity* (June 15, 2021) (EEOC guidance document on protections for LGBT workers).[12] The EEOC also advises investigators to "take great care" in cases involving religious objections. U.S. Equal Emp. Opportunity Comm'n, *Compliance Manual on Religious Discrimination* (Jan. 15, 2021).[13]

---

[12]    https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender.

[13] https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref122.

Plaintiffs have made it clear that they have no intention to hire or retain an employee who engages in homosexual or transgender conduct, and that they will enforce other personnel policies the EEOC prohibits. Pls.' Summ. J. Br. 8–10, ECF No. 90. Based on the EEOC guidance, Plaintiffs stand ready to violate Defendants' pronouncements regarding discrimination against individuals based on sexual orientation and gender identity. Further, many of Plaintiffs' policies *already* run afoul of the EEOC Guidance, including policies regarding dress codes, recognizing marriage only between a man and a woman, and requiring use of bathrooms that conform to biological sex. *See* Exs. 1–5, ECF Nos. 86-1 to -5.

Defendants argue that Plaintiffs' fear of enforcement would have to stem from an instance where "the free exercise rights of an organization were totally disregarded." Takemoto, Transcript 96, ECF No. 109. They contend, for example, that the EEOC did not totally disregard these rights but instead carefully considered them and concluded that Harris Funeral Homes was not substantially burdened. As a result, they argue Plaintiffs have no standing here.

The Sixth Circuit's conclusion that Harris Funeral Homes was not substantially burdened is arguably relevant as to whether Plaintiffs here are substantially burdened. Still, there can be no serious dispute that *Harris Funeral Homes* indicates that Plaintiffs in this case have a credible fear of EEOC enforcement. Plaintiffs' policies mirror and, in many respects, go further than those of Harris Funeral Homes. *Harris Funeral Homes* shows Defendants are actively enforcing Title VII in situations like Plaintiffs'.

Regardless, the Plaintiffs have a credible fear of enforcement based on Defendants' statements in this case. During oral argument, the Court presented the EEOC's counsel with a hypothetical: suppose a church interviews a secretary who says that her religious beliefs about homosexual conduct align with the church's. *See* Transcript 41, ECF No. 109. The church hires

her, then finds out that she, "while truly believing it is against her and [the church's] religious beliefs, engages in homosexual conduct." The Court asked: "Could they fire that person?" Mr. Takemoto, for the EEOC, responded: "Not because they . . . 'engaged in homosexual conduct,' of course." Takemoto, Transcript 41, ECF No. 109. Clarifying, the Court asked, "So the Title VII [exemption] . . . wouldn't permit a religious organization to fire someone who engaged in acts that are violative of their denominational belief?" *Id.* In response, counsel answered, "Subject to all of the other exceptions, that's right, Your Honor." *Id.* This threat of enforcement is sufficient to create a credible fear.

Plaintiffs have declared they will not employ individuals Defendants say are protected. They are therefore subject to a present threat of enforcement. Defendants agree that the relevant inquiry for standing purposes is whether Plaintiffs have a credible fear or threat of enforcement. Takemoto, Transcript 36; *see also Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2497 (Breyer, J., dissenting) (collecting cases) ("We have permitted those whom a law threatens with constitutional harm to bring pre-enforcement challenges to the law where the harm is less serious, and the threat of enforcement is less certain than the harm (and the threat) here."). It is clear that the EEOC is willing to pursue actions against employers that do not comply with its view of Title VII. Thus, the Court concludes that Plaintiffs have Article III standing, therefore, Defendants' Motion for Summary Judgment on this ground is **DENIED**.

### 2. Ripeness

The ripeness doctrine "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review." *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) (A plaintiff's claim "is not ripe for adjudication if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at all." (cleaned up)). The "basic rationale" underlying the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967). Courts evaluate two issues in assessing whether a case is ripe: (1) the fitness of the matter for adjudication, and (2) the hardship to the parties of withholding review. *See Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010).

When a plaintiff seeks a declaratory judgment, courts assess whether a case is ripe and presents sufficient adversity and concreteness by examining whether an "actual controversy" exists between the parties. *Orix Credit All., Inc., v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000). In other words, "it is the underlying cause of action of the *defendant* against the plaintiff that is actually litigated." *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) (emphasis added); *see also id.* at 172 ("The Act is designed to allow potential defendants in cases of actual and *immediate* controversy within the subject matter jurisdiction of the federal courts to petition the court for an early resolution of the parties['] rights and liabilities." (emphasis added)).

Defendants argue that Plaintiffs *may never* need to take adverse employment action against someone who is engaged in homosexual or transgender conduct. *See* Transcript 41–42, ECF No. 109. They assert that Title VII's religious employers exemption already protects Plaintiffs, because it permits them to hire only those who affirm Plaintiffs' religious beliefs—which includes religious beliefs related to homosexuality and transgenderism. Defendants assert that this exemption likely ensures no one who does not already share Plaintiffs' beliefs will seek employment with them. That does not however, resolve the issues presented here. Bear Creek Church has *already* employed three different employees who presumably affirmed the tenets of Christianity that Bear

Creek Church follows and yet were discovered to have engaged in homosexual or transgender conduct. Salveson Decl. 1, ECF No. 90-4. All those instances predated *Bostock*. And now Defendants assert that churches and religious organizations have lost the freedom to fire those who do not conform to an employer's sincerely held religious beliefs, barring the potential application of the ministerial exception. Defs.' Summ. J. Br. 27–30, ECF No. 96; Takemoto, Transcript 41–42, ECF No. 109.

Accordingly, the Court finds that this controversy is sufficiently ripe because it presents several issues that are "purely legal, and will not be clarified by further factual development." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985). Plaintiffs have articulated their religious beliefs, their employment policies, and that they would not employ anyone who violates those beliefs and policies. Defendants intend to enforce the reading of Title VII it has articulated. Litigants are entitled to relief where they "'remain under a constant threat' that government officials will use their power" to enforce the law against them. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (citation omitted). And denying prompt judicial review would impose a substantial hardship on Plaintiffs, forcing them to choose between violating Title VII on one hand, and violating their religious convictions on the other. *See Susan B. Anthony List,* 573 U.S. at 167–68. Therefore, Defendants' Motion for Summary Judgment on ripeness grounds is **DENIED**.

### 3. Sovereign Immunity

The parties agree that RFRA waives sovereign immunity for Plaintiffs' RFRA claim. Defendants claim, however, sovereign immunity is not waived for Plaintiffs' remaining claims, because Plaintiffs cannot establish that they are aggrieved by any final agency action. Plaintiffs counter that they do not need to satisfy the traditional "final agency action" analysis to establish a

waiver of sovereign immunity. They point to the text of 5 U.S.C. § 702 as the express waiver of sovereign immunity. For the following reasons, the Court finds that the United States waived sovereign immunity on Plaintiffs' free exercise, free association, and statutory interpretation claims.

Congress passed legislation in 1976 to waive sovereign immunity in most suits for nonmonetary relief:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. This waiver is not limited to suits under the Administrative Procedure Act. *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *United States v. Murdock Mach. & Engr. Co.*, 81 F.3d 922, 930 n.8 (10th Cir. 1996) (describing § 702 as "a general waiver of the government's sovereign immunity from injunctive relief"). The Fifth Circuit has also endorsed the view that § 702 serves as a waiver of sovereign immunity in suits seeking nonmonetary relief for a cause of action that originates outside of the APA. *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014).

Defendants rely on *Alabama-Coushatta Tribe* for the proposition that plaintiffs must establish a cause of action under § 702 for the waiver of sovereign immunity to apply. *Id.* However, the Fifth Circuit recognized in that case that § 702 also waives sovereign immunity for causes of action that arise outside of the APA. It held:

> Section 702 also waives immunity for claims where a person is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." This type of waiver applies when judicial review is sought pursuant to a statutory or non-

> statutory cause of action that arises completely apart from the general provisions of the APA. There is no requirement of "finality" for this type of waiver to apply. The requirement of "finality" comes from § 704 and has been read into § 702 in cases where review is sought pursuant only to the general provisions of the APA. Instead, for this type of waiver there only needs to be "agency action" as set forth by [5 U.S.C. § 551(13)].

*Id.* at 489 (citations omitted); *see also Cambranis v. Blinken*, 994 F.3d 457, 462–63 (5th Cir. 2021).

Therefore, Plaintiffs are not required to establish "final agency action" for the Section 702 waiver to apply.

There are two requirements to establish waiver under § 702. *Ala.-Coushatta Tribe*, 757 F.3d at 489. "First, the plaintiff must identify some 'agency action' affecting him in a specific way, which is the basis of his entitlement for judicial review." *Id.* "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." 5 U.S.C. § 551(13). The EEOC's guidance documents and its enforcement action against Harris Funeral Homes are "agency actions" under § 551(13). Finality is not necessary for this type of waiver. *Ala.-Coushatta Tribe*, 757 F.3d at 489. The EEOC's enforcement action against Harris Funeral Homes shows that it has given relief to an employee and denied relief to a religious employer concerning the employer's policy. And, as previously explained, the EEOC's guidance goes beyond the holding in *Bostock*, in that it recognizes rights that have not been established by federal law and directs employers to comply with those interpretations. Accordingly, the EEOC has engaged in "agency action" within the meaning of § 702.

"Second, the plaintiff must show that he has 'suffered legal wrong because of the challenged agency action, or is adversely affected or aggrieved by that action within the meaning of a relevant statute.'" *Ala.-Coushatta Tribe*, 757 F.3d at 489 (quoting *Lujan*, 497 U.S. at 883). There is no dispute that Plaintiffs' non-RFRA claims satisfy these two requirements, and the parties agree that Plaintiffs have been aggrieved by that action. *See* Takemoto, Transcript 62, ECF

No. 109. Therefore, Defendants have waived sovereign immunity on Plaintiffs' non-RFRA claims, and Defendants' Motion for Summary Judgment is **DENIED**.

Having resolved all of Defendants' jurisdictional claims in favor of Plaintiffs, the Court next turns to class certification.

### B.  Plaintiffs' Motion for Class Certification

Plaintiffs seek to certify two classes: (1) every employer in the United States that opposes homosexual or transgender behavior for sincere religious reasons ("Religious Employers Class"); and (2) every employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons ("All Opposing Employers Class").[14] Pls.' Mot. 1, ECF No. 71. To certify these classes, Plaintiffs must satisfy Rule 23(a) and Rule 23(b)(2). Even so, this Court has discretion to limit or modify the classes proposed by Plaintiffs. *See Monumental Life*, 365 F.3d at 414.

In the process of class certification, courts may consider the merits of the party's underlying claims.[15] "[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (citation omitted). The Fifth Circuit has "traditionally construed the directive to conduct a rigorous analysis to require district courts to, inter alia, look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Yates v. Collier*, 868 F.3d 354, 362 (5th Cir. 2017) (cleaned up) (citing *Wal–Mart*, 564 U.S. at 351).

---

[14] The All Opposing Employers Class included employers who oppose homosexual or transgender behavior on nonreligious bases.

[15] So-called "fail-safe classes" are those whose membership must be determined using the merits of the underlying claim. Rubenstein, *supra*, at § 3:6.

Considering the merits of the Plaintiffs' claims, the Court modifies the proposed Religious Employers Class, analyzing two religious subclasses separately: the Church-Type Employers Class and the Religious Business-Type Employers Class. Each of the Plaintiffs presents a distinct set of characteristics and claims that are not common to the entire class. First, Bear Creek Church and members of the Church-Type Employers Class operate as religious nonprofits. Church-Type Employers tend to explicitly state a religious purpose in their organizational documents and carry out their mission through instruction, prayer, and worship. They may or may not be affiliated with a larger religious denomination but are generally led by individuals who share the same faith. *See LeBoon,* 503 F.3d at 226–27. As discussed in the following sections, Bear Creek Church and members of the Church-Type Employers Class qualify as religious organizations for the purposes of the Title VII religious exemption.

By contrast, Braidwood and members of the Religious Business-Type Employers Class are for-profit entities producing a secular product. While faith may be a motivating part of the businesses' missions, their incorporating documents generally do not include a religious purpose. For an employer like Braidwood, religion plays an important role, but is not the sole mission of the organization.

The Church-Type Employers Class does not satisfy the commonality prong on any claim arising under Title VII, so the Court declines to certify this class. For the reasons set out in Section III.C, Church-Type Employers qualify as "religious organizations" under the text of the statutory exemption.[16] Because Title VII discrimination claims cannot apply to churches and similar entities in the Church-Type Employers Class, they do not share claims in common with the Religious

---

[16] Plaintiffs' complaint does not seek a declaration that the Church is exempt from Title VII, and their supplemental brief acknowledges that Title VII does not apply to the Church. *See* Am. Compl., ECF No. 86; Pls.' Supp. Br. 3, ECF No. 111.

Business-Type Employers, who are not statutorily exempt. Only the Religious Business-Type Employers meet all the Rule 23 requirements for certification on all five claims.

Finally, because the All Opposing Employers Class does not satisfy the commonality prong on its expressive association claim (that is the lack of *common* expressive association), the Court denies certification on that basis. Otherwise, for the following reasons, the Motion to Certify the Religious Employers Class is **GRANTED in part**, as to the Religious Business-Type Employers Class on all claims, and **DENIED in part** as to the Church-Type Employers Class. The Motion to Certify All Opposing Employers Class is **GRANTED in part**, as to Claims 4 and 5 only.

### 1. Rule 23(a)

#### a. Ascertainability

Defendants argue that Plaintiffs' proposed classes are not ascertainable because the class definitions are too general. Defs.' Br. 25–27, ECF No. 82. Defendants argue that (1) the proposed classes will include employers who oppose homosexual or transgender behavior but may take different approaches in displaying (or not displaying) their opposition; (2) "because individuals' objections can be so varied, members of the class cannot be adequately determined"; and (3) the proposed class definitions are too vague because "many class members will not assert their beliefs at all." *Id.* Plaintiffs counter that there is nothing vague or imprecise about the proposed class definitions because an employer either objects to homosexual or transgender behavior, or it does not. Pls.' Reply 14, ECF No. 92. Further, Plaintiffs argue that it is "unfathomable to think that an employer protected by a classwide injunction would keep [their opposition to homosexual or transgender behavior] secret from the EEOC." *Id.*

While not a requirement of Rule 23, courts only certify classes ascertainable under objective criteria. *See DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).[17] "There can be no class action if the proposed class is 'amorphous' or 'imprecise.'" *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007). "[T]he court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) (internal quotation marks omitted) (quoting Rubenstein, *supra*, at § 3:3). The Fifth Circuit upholds class certification even when a definition necessitates individualized membership assessments that might *follow* litigation, so long as the class definition is sufficiently clear. *See, e.g.*, *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624–25 (5th Cir. 1999).

Moreover, "district courts do not err by failing to ascertain at the Rule 23 stage whether the class members include persons and entities who have suffered 'no injury at all.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014). The class is no less ascertainable because of the existence of employers who oppose homosexual or transgender behavior but, nevertheless, either (1) do not have occasion to take adverse employment action against a person who exhibits homosexual or transgender behavior or (2) choose to not take adverse employment action against a person regardless of their homosexual or transgender behavior.

---

[17] Ascertainability may not be applicable in the Rule 23(b)(2) context. *See, e.g.*, *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3rd Cir. 2015) ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The advisory committee's notes for Rule 23(b)(2) assure us that ascertainability is inappropriate in the (b)(2) context."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability [of class members] is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)."). While the Fifth Circuit has yet to endorse this view shared by other circuit courts, the Court need not decide whether it applies here, because the class is ascertainable.

For similar reasons, subdividing the Religious Employer Class into the Church-Type Employers Class and the Religious Business-Type Employers Class renders the classes more ascertainable by making the definitions of each class more precise.

"As the Supreme Court explained, a 'contention' regarding the class members' injury is sufficient to satisfy Rule 23 . . . ." *Id.* (quoting *Wal–Mart*, 564 U.S. at 350). So long as both types of Religious Employers contend that compliance with Title VII violates their sincerely held religious beliefs, the Court must accept those contentions. *See United States v. Lee*, 455 U.S. 252, 257 (1982) ("We . . . accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith."). The three classes here are not an "amorphous" or "imprecise" definition that the ascertainability doctrine was meant to preclude. *See John*, 501 F.3d at 445 n.3. Accordingly, the Court finds that all three classes are ascertainable.

### b.  Numerosity

Plaintiffs contend that the "number of religious employers who object to homosexual or transgender behavior easily exceeds the numerosity threshold." Pls.' Br. 6, ECF No. 71-1. Although numerosity is likely not genuinely in dispute, Defendants assert that Plaintiffs *have not proven in fact* that the number of employers who oppose homosexual or transgender behavior is so large that joinder is impractical. Defs.' Resp. Br. 21–22, ECF No. 82.

Plaintiffs argue that because the three largest Christian denominations in the United States have official positions denouncing homosexual behavior and prohibit persons who live homosexual lifestyles from working in a leadership position within the church, joinder of all religious employers who may object to homosexual or transgender behavior is impractical. Pls.' Br. 6–8, ECF No. 71-1 (*citing* Catholic Church, *Catechism of the Catholic Church* §§ 2357–59 (2d ed.) ("Basing itself on Sacred Scripture, which presents homosexual acts as acts of grave depravity, tradition has always declared that 'homosexual acts are intrinsically disordered.' . . .

Under no circumstances can they be approved."); Southern Baptist Convention, Position Statements ("Homosexuality is not a 'valid alternative lifestyle.' The Bible condemns it as sin.");[18] The United Methodist Church, *Book of Discipline* ¶ 304.3 (2016) ("The practice of homosexuality is incompatible with Christian teaching.")).

The Church-Type Employers class undoubtedly satisfies the numerosity requirement. There are over 17,000 Catholic parishes in the United States, over 47,000 churches affiliated with the Southern Baptist Convention, and over 30,000 United Methodist churches. Pls.' Br. 7, ECF No. 71-1. Likewise, if even a modest percentage of the nearly 100 million congregants affiliated with these churches have religious objections to homosexuality—and some subset of these objectors are employers themselves—the data suggests that the class of Religious Business-Type Employers easily exceeds forty. *See id.* (citing *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 426 (3d Cir. 2016) ("[N]umerosity is generally satisfied if there are more than 40 class members.")).

Courts have regularly certified classes with far fewer members than the minimum number asserted by Plaintiffs. *See e.g.*, *Mullen*, 186 F.3d at 625 ("[T]he size of the class in this case—100 to 150 members—is within the range that generally satisfies the numerosity requirement."). However, the actual number of class members is not necessarily "the determinative question, for '(t)he proper focus (under Rule 23(a)(1)) is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.'" *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (citation omitted). "[A] number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of

---

[18] http://www.sbc.net/aboutus/positionstatements.asp.

the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.*

Here, Plaintiffs assert that the class of plaintiffs who oppose homosexual and transgender behavior based on sincerely held religious beliefs, and wish to make employment decisions consistent with those beliefs, is sufficiently large. Pls.' Br. 6–8, ECF No. 71-1. As a result, joinder would be impracticable, if not impossible, due to size, geographic dispersion across the nation, and the inclusion of future members.  Pls.' Br. 6–8, ECF No. 71-1. Even though Plaintiffs are unable to approximately estimate the number of members, the Court is satisfied that each class is sufficiently numerous. Even assuming *arguendo* that not every employer who identifies as a Catholic, Baptist, or Methodist fully subscribes to the orthodox teachings of those denominations, the number of employers who would choose to object would easily be in the hundreds, if not thousands. The class members of the Church-Type Employers and Religious Business-Type Employers are necessarily included in the All Opposing Employer Class, therefore, the numerosity requirement is met for all three classes.

### c.  Commonality

The Court will address each of the three classes separately under the commonality factor.

Plaintiffs argue that the following questions of law are common to all employers under the Religious Employer umbrella:

(a)  Whether RFRA compels exemptions to *Bostock*'s interpretation of Title VII (Claim 1);

(b)  Whether the Free Exercise Clause compels exemptions to *Bostock*'s interpretation of Title VII (Claim 2);

(c)  Whether the Free Association rights of the Religious Employers prevails over Title VII's mandates (Claim 3); and

(d)  Whether Title VII permits sex-neutral codes of conduct so long as each biological sex is subjected to the same standard (Claims 4–5).

Pls.' Br. 8, ECF No. 71-1. Bear Creek Church contends that the Supreme Court's interpretation of Title VII currently presents all proposed class members two undesirable alternatives: (1) violate their religious convictions or (2) risk becoming a target for the government's punitive enforcement action. *Id.* In opposition, Defendants argue there is no commonality because RFRA claims must be assessed on a case-by-case basis, analyzing the sincerity of each plaintiff's religious beliefs. *See* Defs.' Resp. Br. 13, ECF No. 82.

"In order to satisfy commonality under *Wal–Mart*, a proposed class must prove that the claims of every class member 'depend upon a common contention . . . that is capable of class-wide resolution . . . .'" *Stukenberg*, 675 F.3d at 838 (quoting *Wal–Mart*, 564 U.S. at 350). This occurs where "the contention is 'of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal–Mart*, 564 U.S. at 350). Put plainly, "Rule 23(a)(2) requires that all of the class member[s'] claims depend on a common issue of law or fact whose resolution 'will *resolve* an issue that *is central to the validity* of each one of the [class members'] claims in one stroke.'" *Id.* at 840 (quoting *Wal–Mart,* 564 U.S. at 350). And a court's "obligation to perform a 'rigorous analysis'" of the commonality prong may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* (quoting *Wal–Mart*, 564 U.S. at 350).

Plaintiffs assert five claims, seeking exemptions to Title VII and challenging the scope of the statute's prohibitions. *See* Am. Compl. 2, 12–26, ECF No. 86. But because the Church-Type Employers are exempt from Title VII under the religious-employers carve-out as discussed below, they need not seek relief under RFRA or the First Amendment for the sex-neutral policies they propose. Without these claims, the Church-Type Employers do not share common questions of

law with the rest of the religious employers, who are not exempt from Title VII. There is no common answer that could relieve both the Church-Type and Religious Business-Type Classes' questions in "one stroke." *Wal–Mart*, 564 U.S. at 350. Consequently, the Church-Type Employers Class fails to satisfy the commonality prong, and the Court declines to certify this Class with respect to all five claims, while the Religious Business-Type Class does satisfy this prong.

For the All Opposing Employer Class, Plaintiffs assert common questions of law regarding:

(a) Whether the Free Association rights of the employers prevail over Title VII's mandates (Claim 3);[19]

(b) Whether Title VII permits sex-neutral codes of conduct so long as each biological sex is subjected to the same standard (Claims 4–5).

Pls.' Br. 8, ECF No. 71-1.

Regarding the free association claim, the All Opposing Employer Class is different than the two religious classes because it includes class members who oppose homosexual and transgender behavior for religious and nonreligious reasons. The common question, though, is whether the All Opposing Employer Class has an expressive interest that is common to the class. The Court finds it does not, because although each class member has a sincere objection to the employment of a person who engages in homosexual or transgender behavior, whether the root of that opposition is religious or nonreligious impacts whether the expression is sufficiently "common" among the All Opposing Employers Class.

Each of the employers within the All Opposing Employer Class does, however, have common questions of whether the proper reading of *Bostock* prohibits them from maintaining sex-neutral standards of conduct for their business. That interest is not negated by the fact that some

---

[19] The Court declines to certify the All Opposing Employer Class on the free association claim, as explained in the following sections.

of the employers in the All Opposing Employers class do not wish to maintain these codes of conduct for a religious purpose. Accordingly, because the free association claim requires an expressive purpose, and Plaintiffs have not met their burden to show what the expressive purpose of the nonreligious objectors could be, the Court declines to certify the All Opposing Employers Class as it relates to the free association claim.[20] Based on the foregoing, the Religious Business-Type Employers Class satisfies the commonality requirement on all claims, but the All Opposing Employers Class only satisfies the commonality requirement for Claims 4 and 5, the sex-neutral code of conduct claims.

### d.  Typicality

Plaintiffs seek to litigate whether RFRA or the First Amendment compels an exception to Title VII (the two subclasses of Religious Employers only), as well as whether Title VII forbids sex-neutral codes of conduct (both Religious Employers classes and All Opposing Employer Class). Plaintiffs assert that their claims are typical of those of the proposed classes, as each class member stands to benefit from a ruling that would allow it to operate its businesses in accordance with its sincerely held religious beliefs, or clarifies the scope of Title VII post-*Bostock*. *See id.* Ultimately, because Bear Creek Church and the Church-Type Employers are exempt from Title VII, they are not burdened by it and need not seek relief. But the claims of the Religious Business-Type Employers Class and the All Opposing Employers Class are typical.

Defendants contend that typicality is not met because the classes necessarily include some who oppose homosexual or transgender behavior but may, despite their sincerely held beliefs, choose to hire individuals who exhibit homosexual or transgender behavior anyway. *See* Defs.'

---

[20] The Court finds that Defendants are correct that the All Opposing Employers Class would also fail to satisfy the typicality requirement as it relates to the free association claim because the class member's nonreligious reasons for opposing homosexual or transgender behavior could vary greatly.

Resp. Br. 16–17, ECF No. 82.  Those employers who object to homosexual or transgender behavior, but do not oppose hiring individuals of that category, of course, would not *need* an exemption to Title VII and are inherently excluded from the class definition.

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 158 n.13. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* "[T]he test for typicality is not demanding. It 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" *Mullen*, 186 F.3d at 625 (citation omitted). "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (internal quotation marks omitted) (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.24[4] (3d ed. 2000)).

As discussed under the "commonality" requirement, the claims of the Church-Type Employers Class and the Religious Business-Type Employers Class do not "share the same legal theory," regardless of their factual similarities. *Id.* Because the Church-Type Employers' Title VII exemption is not typical of all religious employers, their claims are not typical of other religious employers like Braidwood. The Religious Business-Type Employers do not stand to benefit from a ruling exempting the Church-Type Employers from Title VII, because the two classes do not share essential characteristics. Similarly, the Church-Type Employers have no stake in the

remaining Title VII claims applicable to Religious Business-Type Employers, because they are already exempt.

The Court disagrees with Defendants that there is a need for individualized assessment of potential members' claims here that precludes certification. *See* Defs.' Resp. Br. 15–16, ECF No. 82. The sincerity inquiry under RFRA is generally not an exacting one. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (In evaluating sincerity, the Court's "narrow function" is to determine whether the plaintiffs' asserted religious belief "reflects 'an honest conviction.'" (citation omitted)); *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791–92 (5th Cir. 2012) ("Sincerity is generally presumed or easily established," and courts must handle the sincerity inquiry "with a light touch, or 'judicial shyness.'").

Because there is no need for individualized assessment of potential members' claims, any fact-specific inquiries regarding the sincerity of religious belief do not prevent certification of the Religious Business-Type Employers Class. Denying certification on this basis would be especially improper in cases like these, where the proposed class seeks only injunctive and declaratory relief regarding enforcement of a statute, and the usual complications of class certification and phased litigation of suits for money damages do not apply. *See, e.g.*, *Rice v. City of Phila.*, 66 F.R.D. 17, 19 (E.D. Pa. 1974) ("[T]he precise definition of the [Rule 23(b)(2)] class is relatively unimportant. If relief is granted to the plaintiff class, the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance . . . ."); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 409 (5th Cir. 1998) (noting differing approaches to certification and litigation of individual trials for damages). Even if individualized assessments were necessary, they can be made after class certification. *See, e.g.*, *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019) (recognizing that the Fifth Circuit has required

that the class be ascertainable only "at some stage of the proceeding," not that it be "currently and readily ascertainable" (internal quotation marks and citation omitted)).

"The bottom-line question under commonality and typicality is whether the relief the named plaintiffs seek from the Court will resolve all class members' legal claims." *Vita Nuova, Inc. v. Azar*, No. 4:19-cv-532, 2020 WL 8271942, at *8 (N.D. Tex. Dec. 2, 2020). The claims of Bear Creek Church and the Church-Type Employers do not share the "same essential characteristics of those of the putative class," because their exemption from Title VII protects "religious employers" from having to choose between violating the law or violating their convictions. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (internal quotation marks and citation omitted). By contrast, Braidwood's claims have the same essential characteristics of the All Opposing Employers Class in that Title VII, under *Bostock*, does not prohibit sex-neutral codes of conduct that apply equally to each biological sex. For these reasons, the Court finds that the typicality requirement for certification of the Religious Business-Type Employers Class is satisfied on all claims and the typicality requirement for certification of the All Opposing Employers Class is satisfied as it relates to the sex-neutral codes of conduct claims. The Church-Type Employers Class does not satisfy the typicality requirement.

### e. Adequacy of Representation

Plaintiffs assert that they "will fairly and adequately represent the interests of its fellow class members, and there are no conflicts of interest between [Plaintiffs] and the other members of this class." Pls.' Br. 10, ECF No. 71-1. Defendants argue that Plaintiffs have failed to demonstrate adequacy of representation for the same reasons it contests commonality and typicality above. *See* Defs.' Resp. Br. 17–21, ECF No. 82.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Adequacy encompasses three separate but related inquiries (1) 'the zeal and competence of the representative[s'] counsel'; (2) 'the willinginess [sic] and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees'; and (3) the risk of 'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Slade v. Progressive Sec. Ins.*, 856 F.3d 408, 412 (5th Cir. 2017) (alterations in original) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)). "[The] requirements [of commonality and typicality] . . . tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Falcon*, 457 U.S. at 158 n.13. Throughout litigation, the court "must continue carefully to scrutinize the adequacy of representation and withdraw certification if such representation is not furnished." *Grigsby v. N. Miss. Med. Center, Inc.*, 586 F.2d 457, 462 (5th Cir. 1978).

Here, as to Claims 1–3, only Braidwood has carried its burden to show that, as a Christian employer opposed to homosexual and transgender behavior, it will adequately represent the interests of Religious Business-Type Employer class members similarly situated in zealously pursuing the requested relief. All indications are that Braidwood is willing and able to control the litigation and to protect the interests of absent class members. *See Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). Further, Braidwood has also shown that it will zealously pursue the questions that are common to the class of All Opposing Employers: the sex-neutral codes of conduct claims. Mitchell, Transcript 16, ECF No. 109 ("And they're trying to protect the prerogative of every employer in this country to organize their place of business and

arrange their employment practices as they see fit, regardless of whether they are being done for religious or nonreligious reasons.") Given that the Religious Business-Type Class satisfies the commonality and typicality prongs, *supra*, and because no conflicts of interest, issues with competency of counsel, or other issues suggesting inadequacy of Braidwood's representation have been shown, the Court finds Braidwood will adequately represent members of the proposed All Opposed Employers and Religious Business-Type Employers Class.

Accordingly, the Court concludes that Plaintiffs have satisfied the elements for class certification for the Religious Business-Type Employers Class on all claims and the All Opposing Employers Class on Claims 4 and 5 under Rule 23(a). The Court next turns to whether the elements of Rule 23(b) are satisfied.

### 2.  Rule 23(b)(2)

Class certification under Rule 23(b)(2) is appropriate if the requirements of 23(a) are satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way, and injunctive relief must predominate over monetary damages. *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975–76 (5th Cir. 2000). Additionally, the injunctive relief order must be specific. Fed. R. Civ. P. 65(d); *see also Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 387–88 (5th Cir. 1980). Here, Plaintiffs seek only declaratory and injunctive relief. Plaintiffs seek a declaration, based on their beliefs embodied in their employment policies, that employers like Braidwood are entitled to protection under RFRA and the First Amendment mandates of Title VII as it relates to sex discrimination. Plaintiffs also argue that religious employers are still permitted to have sex-neutral

40

codes of conduct governing their employees, even if those sex-neutral codes of conduct have a disparate impact on individuals who engage in homosexual or transgender behavior. The Court finds that this type of relief satisfies Rule 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to the Religious Business-Type Employers Class and the All Opposing Employers Class (on some grounds). Thus, class-wide relief is appropriate. Having found that Plaintiffs' Motion to Certify the Religious Employer Class should be **GRANTED in part** as to the Religious Business-Type Employers Class, and the Motion to Certify the All Opposing Employer Class should be **GRANTED in part**, the Court turns to the merits of the Plaintiffs' claims with respect to Braidwood.

### C. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on the grounds that (1) RFRA compels a religious exemption to Title VII as it relates to discrimination on the basis of homosexual or transgender behavior; (2) Title VII violates the Free Exercise Clause of the First Amendment; (3) Title VII violates the Freedom of Association Clause of the First Amendment; (4 & 5) Title VII does not prohibit employers from establishing sex-neutral standards of conduct for employment, even if those rules have the effect of discriminating against homosexual or transgender behaviors.

### 1. Claim 1: Religious Freedom Restoration Act

Plaintiffs[21] seek to be exempted from Title VII, because they assert that compliance with Title VII, as interpreted in *Bostock*, would substantially burden their religious beliefs regarding homosexual and transgender conduct. Pls.' Summ. J. Br. 10–15, ECF No. 90. Defendants argue that RFRA does not provide any protections against sex discrimination, because a religious employer is not substantially burdened by accommodating a person who is engaged in homosexual

---

[21] Claims 1–3 apply only to the Religious Business-Type Employers Class. Claims 4 and 5 apply to both the Religious Business-Type Employers Class and the All Opposing Employers Class.

or transgender behaviors contrary to the employer's sincerely held religious beliefs. Defs.' Summ. J. Br. 10, ECF No. 96.

RFRA "was designed to provide very broad protection for religious liberty." *Hobby Lobby*, 573 U.S. at 706. RFRA prohibits the government from substantially burdening the exercise of religion. 42 U.S.C. § 2000bb-1(b). Courts apply a deferential standard in favor of the religious claimant when determining whether conduct is "religious exercise." *See id.* at 696. When RFRA applies, it requires the federal government to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest. *Id.* at 690–91.

As Title VII exempts "religious employers," Bear Creek Church cannot be burdened by it, and has no need to seek relief under RFRA. *See LeBoon*, 503 F.3d at 226 (listing the "religious employer" factors). As a church, Bear Creek falls squarely within this exemption. Braidwood's characteristics, however, weigh against concluding it falls within this exemption.

### a. Title VII Exemption: Bear Creek Church

As stated in Section I.E.1, Title VII does not apply to religious organizations. To determine whether an entity is a religious organization, courts consider the *LeBoon* factors. As applied to this case, all nine *LeBoon* factors weigh in favor of Bear Creek Church's classification as a religious organization. Incorporated as a nonprofit, Bear Creek Church holds itself out as a nondenominational place of worship, where prayer and religious activities are central to its "sectarian" mission. *See* Am. Compl. ¶ 3, 25, ECF No. 86. The language used in Factors 4 and 5 ("formal religious entity such as a church") places churches at the very center of the exemption's protection. Plaintiffs succinctly state the point: "If churches cannot qualify for the religious-employer statutory exemption . . . then no one can." Pls.' Supp. Br. 7, ECF No. 111.

Because Bear Creek Church is exempt from Title VII pursuant to its terms, its RFRA claim—and all four remaining claims under Title VII—must be dismissed. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Bear Creek Church's Title VII claims.

### b.  Title VII Exemption: Braidwood Management

By contrast, neither Plaintiffs nor Defendants argue that Braidwood satisfies the *LeBoon* test. *See* Pls.' Supp. Br. 7, ECF No. 111; Defs.' Supp. Br. 3, ECF No. 115. Some factors, like praying daily and employing only Christians, weigh in Braidwood's favor. The remaining factors weigh against. The company operates for a profit, promoting secular products related to health and wellness. *See* Decl. of Hotze ¶ 5, ECF No. 74-1. Although a "core value" of each of Braidwood's businesses is "to worship God in [their] work," the articles of incorporation do not state a religious purpose. *Id.* ¶ 9. The organization is not owned, affiliated, or managed by a formal religious entity like a church. *Id.* ¶ 4. And although the company's internal operations may reflect religious principles, there is no evidence that it holds itself out to the public as a religious company.

Even so, Plaintiffs argue the contrary. Secular organizations do not start weekly staff meetings with prayer, so by contrast, Braidwood must be religious. Pls.' Supp. Br. 8, ECF No. 111. They also argue that in *Hobby Lobby*, the Supreme Court concluded for-profit corporations may practice religion. *Id.* That Braidwood incorporates religious values and practices into its business model is persuasive, but its "characteristics . . . taken together" do not point to the conclusion that Braidwood is a religious organization for purposes of the Title VII exemption. *See LeBoon*, 503 F.3d at 229. Absent further guidance from the Fifth Circuit on how to apply these Title VII definitions, the *LeBoon* factors are persuasive. *See Scaffidi*, No. 18-4113, 2020 WL 1531266, at *4–*5 (E.D. La. Mar. 31, 2020).

Though Braidwood does not qualify for Title VII's statutory exemption, it succeeds on its RFRA claim.

### c. Braidwood's RFRA Claim

To prevail on its RFRA claim, Braidwood must first show that Title VII would substantially burden its sincere exercise of religion. *See City of Boerne*, 521 U.S. at 534. If Braidwood carries that burden, Defendants must then show a compelling interest that is advanced using the least restrictive means. If "compelling interest" really means what it says, many laws will not meet the test. *See id.*

The Supreme Court held that requiring individuals to "engage in conduct that seriously violates their religious beliefs" imposes a substantial burden on their exercise of religion. *Hobby Lobby*, 573 U.S. at 720. If an employer sincerely believes that the conduct demanded by the state violates its religious convictions, then courts are forbidden to question the reasonableness of that belief. *Id.* at 724. There is no dispute in this case that Braidwood sincerely exercises its religious beliefs as embodied in its employment policies. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) ("[U]nder RFRA, the Departments must accept the sincerely held complicity-based objections of religious entities. That is, they could not tell the plaintiffs that their beliefs are flawed because, in the Department's view, the connection between what the objecting parties must do and the end that they find to be morally wrong is simply too attenuated." (cleaned up)). And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

#### i.   Substantial Burden

Because Braidwood holds a sincere religious belief, the only question to resolve is whether Title VII substantially burdens Braidwood's ability to conduct business in accordance with those beliefs. *See Hobby Lobby*, 573 U.S. at 720. To establish a substantial burden, a plaintiff must (1) identify the religious exercise; (2) allege that the challenged law pressures plaintiff to modify that exercise; and (3) show that the penalty for noncompliance is substantial. *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 456 (5th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016), and *cert. granted, judgment vacated sub nom. Univ. of Dall. v. Burwell*, 136 S. Ct. 2008 (2016).

Braidwood argues that Title VII substantially burdens its ability to conduct its businesses in accordance with its sincerely held religious beliefs. Pls.' Summ. J. Br. 11, ECF No. 90. Defendants argue that the EEOC Guidance documents are "nonbinding" and that the EEOC Compliance Manual tells EEOC investigators to "take great care" in situations involving RFRA and the First Amendment; therefore, whether the EEOC substantially burdens Plaintiffs is too fact-specific to decide within the context of declaratory judgment. Defs.' Summ. J. Br.  24, ECF No. 96.

Braidwood claims to have "sincere and deeply held religious beliefs that marriage is limited to a man and a woman, that sex is to be reserved for marriage, and that men and women are to dress and behave in accordance with distinct and God-ordained, biological sexual identity." Pls.' Summ. J. Br. 12, ECF No. 90. Braidwood also alleges that it believes it is "called by God to obey the civil authorities." *Id.* No one doubts its sincerely held beliefs.

The Court finds that Title VII substantially burdens Braidwood's religious exercise in conducting its business. Again, the first element is not disputed. For the second, the religious

employers are required to choose between two untenable alternatives: either (1) violate Title VII and obey their convictions or (2) obey Title VII and violate their convictions. Accordingly, the second element is met. The third element is met as well, as the penalty for non-compliance would be EEOC enforcement, which would subject Braidwood to liability for backpay, compensatory damages, and punitive damages.

Because Braidwood has proven that a substantial burden exists, Defendants must show that the substantial burden is justified by a compelling interest and that they have chosen the least restrictive means of advancing that interest.

### ii.    Compelling Interest

In a single paragraph, Defendants argue that "it is beyond dispute that the government has a compelling interest in eradicating workplace discrimination," and that RFRA provides "no protection for 'discrimination in hiring . . . cloaked as religious practice.'" Defs.' Summ. J. Br. 24, ECF No. 96 (quoting *Hobby Lobby*, 573 U.S. at 733)). Defendants' overly broad formulation of its compelling interest is without merit. Rather than rely on "'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *See Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021); *see also Hobby Lobby,* 573 U.S. at 726 (holding that the government's formulation of its compelling interest as "public health" and "gender equality" is overly broad). The relevant question, rather, is whether the government has a compelling interest in *denying* employers like Braidwood a religious exemption. *See Fulton*, 141 S. Ct. at 1881.

Braidwood has established Title VII places a substantial burden on its religious exercise, and Defendants fail to meet its burden to show a compelling interest. But even if their broad formulation of their interest in "preventing all forms of discrimination" were sufficient, Defendants

have not selected the least restrictive means. Forcing a religious employer to hire, retain, and accommodate employees who conduct themselves contrary to the employer's views regarding homosexuality and gender identity is not the least restrictive means of promoting that interest, especially when Defendants are willing to make exceptions to Title VII for secular purposes.[22]

Therefore, Plaintiffs' Motion for Summary Judgment on its RFRA claim is **GRANTED** with respect to Braidwood and the Religious Business-Type Employers Class, and Defendants' Motion for Summary Judgment on the same is **DENIED.** The Court need not address Bear Creek Church's RFRA claim, because the Church falls squarely within the Title VII exemption for religious employers. Defendants' Motion for Summary Judgment is **GRANTED** with respect to Bear Creek's Title VII claims (Claims 1–5).

### 2. Claim 2: Free Exercise Clause of the First Amendment[23]

Braidwood argues that the Free Exercise clause also supports an exemption from Title VII, because (1) Defendants have infringed on its religious exercise, (2) by means of a regulation that is not neutral, and (3) lacks a compelling governmental interest to justify the infringement. Pls.' Mot. 1–2, ECF No. 72.

---

[22] For example, Defendants are willing to grant exemptions from Title VII for, among others, employers with fewer than fifteen employees and for employers on or near Indian reservations. 42 U.S.C. §§ 2000e, 2000e-2(i). A more detailed discussion of Title VII's carve-outs continues in the following section, but suffice it to say that carve outs undermine Defendants' argument that Title VII is meant to eradicate *all* forms of discrimination.

[23] Defendants argue that, as a matter of constitutional avoidance, the Court should not reach this issue if relief is granted on the RFRA claim. Defs.' Summ. J. Br.  26, ECF No. 96. The canon of constitutional avoidance is defined in two ways. First, courts should avoid interpreting ambiguous statutes in a way that raises serious constitutional problems. *Hersh v. U.S. ex rel Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008); *see* Larry M. Eig, Cong. Res. Serv., Report 97-589, *Constitutional Interpretation: General Principles and Recent Trends* 46 (2011). Under the second definition, which Defendants use here, courts should avoid granting relief on constitutional grounds if relief on statutory grounds is possible. *See Slack v. McDaniel*, 529 U.S. 473, 485 (2000). In the interest of judicial economy, at the district court, the Court will rule on all five claims so that the Court of Appeals may be presented with all issues.

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. Const. amend. I (emphasis added). The First Amendment protects both the freedom to believe and the freedom to act. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). While the freedom to believe is absolute and can never be restricted by the government, the freedom to act must sometimes be regulated by the government for the protection of society. *Id.* at 303–04.

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the Free Exercise Clause does not exempt an individual from complying with a law that places an incidental burden on religious exercise so long as that law is facially neutral and generally applicable. *Id.* at 878–79. The Supreme Court also held that such generally applicable and facially neutral laws would not be subjected to strict scrutiny. *Id.* Therefore, if the law at issue is generally applicable, then strict scrutiny does not apply, but if the law is not generally applicable, then the strict scrutiny analysis is triggered. *Id.*

### a. *Fulton v. City of Philadelphia*

In *Fulton*, the Supreme Court held that the City of Philadelphia's refusal to contract with Catholic Social Services for the provision of foster care unless Catholic Social Services agreed to certify same-sex couples as foster parents violated the Free Exercise clause of the First Amendment. 141 S. Ct. at 1882. The City burdened the religious exercise of Catholic Social Services by forcing the foster care agency to choose between approving relationships inconsistent with its beliefs or ceasing to provide adoption services to the City. As Catholic Social Services believes that marriage is a sacred bond between a man and a woman and that the certification of prospective same-sex foster families was tantamount to an endorsement of those relationships, it refused to certify. *Id.* at 1877.

Because the City provided for individualized exemptions for nonreligious entities, the non-discrimination requirement was not generally applicable. Since it was not generally applicable, the City needed a compelling interest to refuse an exemption in cases of religious hardship. *Id.* at 1881. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *See Tandon*, 141 S. Ct. at 1296 (emphasis added). And as explained in the following section, Congress similarly permitted nonreligious exemptions in Title VII, triggering strict scrutiny in this context.

### b.  Title VII's Secular Exemptions

Defendants' argument that they had an interest in eradiating all forms of discrimination is undercut by their willingness to grant exemptions for other purposes. By its express terms, Title VII does not apply to every employer. For example, for no apparent reason other than administrative convenience, Title VII exempts businesses with fewer than fifteen employees. *See* 42 U.S.C. § 2000e. Notably, Title VII overtly permits employers, with a specific statutory exclusion, to fire an employee if the employee is a member of the Communist Party of the United States or affiliated with a Communist-front organization. *See id.* § 2000e-2(f). Title VII also categorically permits employers on *or near* Indian reservations to discriminate on the basis of race or national origin in favor of Indians. *See id.* § 2000e-2(i). These exemptions are "secular" in nature. Since Defendants extend these exemptions to nonreligious decisions, they must treat requests for religious exemptions the same. *See Tandon*, 141 S. Ct. at 1296 (holding that a government regulation is not neutral and generally applicable whenever they treat any comparable secular activity more favorable than religious exercise).

### c.  Strict Scrutiny

Because Title VII is not a generally applicable statute due to the existence of individualized exemptions, the Court finds that strict scrutiny applies. *See Tandon*, 141 S. Ct. at 1296. Further, the Court has already determined that Title VII places a substantial burden on the Religious Business-Type Employers, and Defendants must identify a compelling interest to prevail. Defendants argue that their interest in "preventing discrimination" is compelling, and thus outweighs the substantial burden on Plaintiffs' religious exercise. Defs.' Summ. J. Br.  26, ECF No. 96. For the same reasons the Supreme Court articulated in *Fulton*, the Court finds otherwise here.

The Court does not doubt that Defendants' interests in preventing discrimination against homosexual and transgender individuals is "a weighty one, for our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." *Fulton*, 141 S. Ct. at 1882 (cleaned up). But broadly formulated government interests are not sufficient to withstand a First Amendment challenge. The creation of a system of exceptions under Title VII undermines Defendants' contention that its non-discrimination policies "can brook no departures." *Id.*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993). Defendants offer "no compelling reason why it has a particular interest in denying an exception to [the Religious Business-Type Employers] while making them available to others." *Fulton*, 141 S. Ct. at 1882.

Courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants" and "look to the marginal interest in enforcing" the challenged government action in that particular context. *Hobby Lobby*, 573 U.S. 726–27. Defendants have not articulated how granting specific exemptions for employers like Braidwood will harm the asserted interests

in "preventing discrimination." Further, the Court finds that they have failed to state how their interest, if it is compelling, is narrowly tailored. Therefore, the Court holds that the Free Exercise Clause of the First Amendment compels Defendants to permit the Religious Business-Type Employers Class to make employment decisions consistent with their cited religious beliefs as embodied in their employment policies in the Title VII context.

### 3.   Claim 3: Right of Association[24]

Plaintiffs argue that the right of free association within the First Amendment also compels an exception to Title VII. *See* Pls.' Summ. J. Br. 17, ECF No. 90.

"Believing in the power of reason as applied through public discussion, [those who won our independence] eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." *Whitney v. California*, 274 U.S. 357, 375-76 (1927), *overruled in part by Brandenburg v. Ohio*, 395 U.S. 444 (1969). In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court observed that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 622. This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas. *See id.* (stating that protection of the right to expressive association is "especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority").

---

[24] This section applies only to the Religious Business-Type Employer Class, because the Court denied certification of the All Opposing Employers Class on the free association claim and dismissed Bear Creek's remaining claims based on the Title VII religious employers exemption.

Government actions that unconstitutionally burden this freedom may take many forms, one of which is "intrusion into the internal structure or affairs of an association" like a "regulation that forces the group to accept members it does not desire." *Id.* at 623. Forcing a group to accept certain members may impair the ability of the group to express its views. Thus, "freedom of association plainly presupposes a freedom not to associate." *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (cleaned up) (quoting *Roberts*, 468 U.S. at 623). "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995).

In *Boy Scouts*, the Supreme Court held that the Boy Scouts' right of expressive association prevailed over anti-discrimination law. *See* 530 U.S. at 656. "The Boy Scouts assert[ed] that homosexual conduct is inconsistent with the values embodied in the Scout Oath and Law, particularly with the values represented by the terms 'morally straight' and 'clean.'" *Id.* at 650. "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* (citing *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 13 (1988)). "But the freedom of expressive association, like many freedoms, is not absolute. We have held that the freedom could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* at 648 (quoting *Roberts*, 468 U.S. at 623). The Supreme Court concluded that the forced inclusion of a gay-rights activist as an

52

assistant scoutmaster would impair the expressive association rights of the Boy Scouts. *See id.* Therefore, the Boy Scouts prevailed on its First Amendment freedom of association claim. *Id.*

To prevail on a right of association claim, Plaintiffs must establish an expressive activity that is substantially burdened by government action. *See id.* at 650, 653. If they do, Defendants may prevail if they articulate a compelling interest that is narrowly tailored. *See id.* at 656–58.

Defendants argue that the Free Association Clause does not provide protection for employers who violate Title VII. Defs.' Summ. J. Br.  27–28, ECF No. 96 (citing *Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984)). They also argue that the Plaintiffs must also *operate* for an expressive purpose to pursue a free association claim. Defs.' Summ. J. Br.  28, ECF No. 96.

### a.  Expressive Association

Plaintiffs assert that they are entitled to First Amendment protection of their expressive association, which includes the right to *not* associate. Pls.' Summ. J. Br. 17, ECF No. 90. To determine whether a group is protected by the First Amendment's expressive associational right, the Court must determine whether the group engages in "expressive association." *Boy Scouts*, 530 U.S. at 648. "The First Amendment's protection of expressive association is not reserved for advocacy groups." *Id.* Therefore, for-profit businesses like Braidwood may pursue a right of association claim. "But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Id.* The Court cannot be guided by whether Braidwood's desire to not associate with homosexual or transgender individuals is right or wrong, because even "judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message." *Id.* at 661.

The Court finds that Braidwood is engaged in overt expression regarding its religious views of homosexuality and transgender behavior. Hotze specifically operates his companies as Christian businesses. He does not allow Braidwood to hire or employ individuals who engage in "homosexual conduct or gender non-conforming behavior," including homosexuality, cross-dressing, and transgenderism. *See* Hotze Decl. 3, ECF No. 90-5. Hotze does not allow Braidwood to recognize same-sex marriage or extend benefits to an employee's same-sex partner, because he believes that would lend approval to homosexual behavior and make him complicit in sin, in violation of his sincerely held religious beliefs. *Id.* Like the Boy Scouts, Plaintiffs have documented and publicly expressed their opposition to homosexuality and transgender conduct. And, as stated above, it is not necessary that Plaintiffs operate as advocacy groups to be entitled to First Amendment protection. *See Boy Scouts*, 530 U.S. at 648. Therefore, the Court finds the Religious Business-Type Employers are engaged in expressive association.

### b. Compelling Interest

Defendants must then assert a compelling interest to overcome Plaintiffs' First Amendment claim. Counsel for Defendants cites *Hishon v. King & Spaulding*, 467 U.S. 69 (1984), for the proposition that freedom of association is no defense to a claim of discrimination under Title VII. In *King & Spauling*, the Supreme Court held that a law firm did not meet its burden to show how its expressive association would be impaired by permitting a female to make partner. *See* 467 U.S. at 78. The Supreme Court further stated that "[i]nvidious discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Id.* (alteration in original). Defendants assert that the case forecloses freedom of association claims in the employment context.

Plaintiffs argue that this case is much more like *Boy Scouts*. They also claim that if the Supreme Court believed that there was a compelling interest in this context, *Boy Scouts* would have turned out differently.[25] Because *Bostock* did not deal with a freedom of association claim, and *King & Spaulding* merely held that the employer in that case did not meet its burden to prove expressive association, the Court concludes that *Boy Scouts* is the most analogous case. For the same reasons that Defendants do not have a compelling interest in forcing an organization to retain, as a scoutmaster, a member who is a gay rights activist, Defendants do not have a compelling interest in forcing Religious Business-Type Employers to hire and retain individuals that engage in conduct that is contrary to the employers' expressive interests. "The Government can no more force an association that opposes homosexuality or transgender behavior to hire individuals engaged in that conduct than it can force a gay-rights organization to hire an avowed opponent of homosexuality." Pls.' Summ. J. Br. 17–18, ECF No. 90. Therefore, Plaintiffs' Motion for Summary Judgment on this claim is **GRANTED** as to the Religious Business-Type Employer Class**.**

### 4.   Claims 4 and 5: Sex-Neutral Rules of Conduct[26]

At its core, these final claims stem from a dispute regarding the reach of *Bostock*.[27] Pls.' Summ. J. Br. 22, ECF No. 90. Defendants argue that *Bostock* holds discrimination based on gender

---

[25] "And the answer to that is just as the Supreme Court made clear in *Boy Scouts* that, if there were a compelling interest, the Boy Scouts would have to come out the other way, because there's no way the Boy Scouts could possibly maintain a claim of First Amendment associational freedom if the anti-discrimination norm, when it comes to sexual orientation or gender identity, were a compelling interest that trumps constitutional freedoms. So we know just from *Boy Scouts* that the Court can't just say no compelling interest. . . . That may work in the race context, but it doesn't work here because of *Boys Scouts*." Mitchell, Transcript 86, ECF No. 109.

[26] This section applies to the Religious Business-Type Employer Class and All Opposing Employer Class.

[27] "Although the Court does not want to think about the consequences of its decision, we will not be able to avoid those issues for long. The entire Federal Judiciary will be mired for years in disputes about the reach of the Court's reasoning." *Bostock*, 140 S. Ct. at 1783 (Alito, J., dissenting).

identity and sexual orientation is now outlawed by Title VII. Defs.' Summ. J. Br. 30–32, ECF No. 96. Plaintiffs claim that Title VII still permits employers, religious and nonreligious alike, to have sex-neutral codes of conduct that govern their employees. Pls.' Summ. J. Br. 20–21, ECF No. 90. Plaintiffs contend that they can establish and maintain these rules consistent with Title VII even if these rules have a disparate impact on individuals who exhibit homosexual or transgender behavior. *Id.* They further argue that the Supreme Court expressly recognized that "sex" and homosexuality and transgenderism are distinct concepts, and that if the Supreme Court wanted to hold explicitly that any discrimination based on gender identity or sexual orientation always violated Title VII, the Supreme Court would have said so. Plaintiffs argue that Defendants have oversimplified the holding in *Bostock*, which is an extremely technical and methodical analysis of sex discrimination. Pls.' Summ. J. Br. 21, ECF No. 90.

The Supreme Court acknowledged that *Bostock* raised these kinds of questions, and that they would need to be adjudicated in later cases. *See* 140 S. Ct. at 1753 ("Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these."). This Court now turns to these first-impression issues.

### a. *Bostock v. Clayton County*

In *Bostock*, the Supreme Court consolidated three employment cases[28] and resolved each in favor of the employee. The simple test in *Bostock* is that a Title VII sex discrimination claim is established if, *keeping all things the same*, the discrimination would not have happened but for the

---

[28] Consolidated cases include *Altitude Express Inc. v. Zarda*, No. 17-1623, 2019 WL 1756678 (U.S. argued Oct. 8, 2019); *Bostock v. Clayton County*, No. 17-1618, 2019 WL 1756677 (U.S. argued Oct. 8, 2019); and *R.G. & G.R. Harris Funeral Homes v. EEOC*, No. 18-107, 2019 WL 1756679 (U.S. argued Oct. 8, 2019).

employee's biological sex. *Id.* (emphasis added). If the prohibited motive is not a but-for[29] cause of an event, then by definition it did not make a difference in the outcome. The event would have occurred just the same without it. Common-law approaches to causation often require proof of but-for cause as a starting point toward proof of legal cause. "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." W. Keeton et al., *Prosser and Keeton on Law of Torts* 265 (5th ed. 1984).

*Bostock* continuously asserted that the Title VII analysis is a simple "but-for" test. According to *Bostock*, courts are directed to change only one variable (biological sex), and if the outcome changes, then the employer violates Title VII. "The question isn't just what 'sex' meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions 'because of' sex. And, as [the] Court has previously explained, 'the ordinary meaning of "because of" is "by reason of" or "on account of."'" *Bostock*, 140 S. Ct. at 1739 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)). That means that "Title VII's 'because of' test incorporates the '"simple"' and 'traditional' standard of but-for causation." *Id.* (quoting *Nassar*, 570 U.S. at 346, 360). But-for causation is present "whenever a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to *change one thing at a time* and see if the outcome changes. If it does, we have found a but-for cause." *Id.* (citation omitted). This is simple enough—but then the majority opinion uses analogies that did not always "change one thing at a time." *Id.*

---

[29] The Supreme Court explained that "[i]t doesn't matter if other factors besides the plaintiff's sex contributed to the decision," which would indicate that if more factors than one changed, mirroring a causation test more like "substantial factor" rather than the traditional "but-for" test, then Title VII is also violated. *Bostock*, 140 S. Ct. at 1741; *see also* Keeton et al., *supra*, at 265 ("An act or omission is not regarded as a cause of an event if the particular event would have occurred without it.").

### b.  Favoritism vs. Blindness

Two diverging tests have emerged in Title VII sex discrimination litigation: favoritism and blindness. *See Wittmer v. Phillips 66 Co*., 915 F.3d 328, 333–34 (5th Cir. 2019) (Ho, J., concurring). *Bostock* did not explicitly endorse one or the other. Under the longstanding view before *Bostock*, "Title VII prohibits employers from favoring men over women, or vice versa. By contrast, under the approach recently adopted in three circuits, Title VII does more than prohibit favoritism toward men or women—it requires employers to be entirely blind to a person's sex." *Id.*

It is unclear what approach the Supreme Court adopted in *Bostock*, if either. The Court held: "An employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Bostock*, 140 S. Ct. at 1741. In other words, "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred," which indicates a simple but-for test, i.e., favoritism. That general statement of the rule indicates that the proper approach is favoritism because the employer violates Title VII if it intentionally fires an individual "based on" or "but-for" the person's biological sex. The favoritism test predominates many of the analogies used in *Bostock*. *See* 140 S. Ct. at 1740 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent."). The traditional analysis would begin and end with that question. It necessarily follows, then, as Plaintiffs argue in this case, that if men and women are subjected to the same standards of conduct, then that policy is not discriminating "because of" sex.

The Supreme Court went on to explain, though: "[I]t doesn't matter if the employer treated women as a group the same when compared to men as a group." *Bostock*, 140 S. Ct. at 1741. It is

therefore no defense[30] for an employer who is alleged to have discriminated against a woman to argue that it treats all women favorably as compared to men.

However, when the *Bostock* Court analyzed homosexuality and transgenderism, it seemed to endorse the blindness approach. "Title VII's message is 'simple but momentous': An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Id.* at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)). This articulation of the rule indicates an endorsement of the blindness approach, in that sex is "not relevant" to employment decisions or policies. Further, the Court stated that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," which would indicate that an employer cannot consider an individual's biological sex at all (i.e., blindness), or any other trait that hinges on biological sex, when making employment decisions.[31]

The Supreme Court then appears to endorse the blindness test again when considering a specific example of discrimination based on homosexual or transgender behavior. "When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies)." *Bostock*, 140 S. Ct. at 1742. So treating a male employee

---

[30] "Suppose an employer fires a woman for refusing his sexual advances. It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall." *Bostock*, 140 S. Ct. at 1741.

[31] Justice Alito recognized the potential absurdities that result from a universally applied blindness test. *Bostock*, 140 S. Ct. at 1761 (Alito, J., dissenting) ("Title VII prohibits discrimination because of sex itself, not everything that is related to, based on, or defined with reference to, 'sex.' Many things are related to sex. Think of all the nouns other than 'orientation' that are commonly modified by the adjective 'sexual.' Some examples yielded by a quick computer search are 'sexual harassment,' 'sexual assault,' 'sexual violence,' 'sexual intercourse,' and 'sexual content.'").

differently from a female employee with regard to a secondary trait violates Title VII when the secondary trait is necessarily related to sex.[32]

But then the Supreme Court invoked the favoritism test again: "If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach." *Id.* at 1742. Further, when the Supreme Court analyzed the term "discriminate," it indicated that the proper test is whether the employer treats a person worse (than the other biological sex) because of the employee's biological sex (favoritism).

The question becomes: What did "discriminate" mean in 1964? As it turns out, it meant then roughly what it means today: "To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person means "treating that individual worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740. In "disparate treatment" cases, "the difference in treatment based on sex must be intentional." *Id.* "[T]aken together, an employer who intentionally treats a person *worse* because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII." *Id.*

### c. Favoritism, Plus Blindness

The Court concludes that absent guidance from the Circuit the proper test must be favoritism, plus blindness to sex if the secondary trait is homosexuality or transgenderism.[33] The simple favoritism test cannot be fully reconciled with the Supreme Court's analogies, and neither can the blindness test standing alone given *Bostock*'s articulation of the standard. *Id.* at 1741 ("[I]f

---

[32] Here, the Court again notes that Plaintiffs assert that they do not consider a person's identity as a bar to employment, but rather the employee's conduct. *See supra* note 1.

[33] Counsel for Defendants seems to agree that a policy that targets homosexuality or transgenderism violates Title VII, regardless of whether the employer would fire both sexes, because the employer in those cases is not blind to sex. Takemoto, Transcript 31, ECF No. 109 "And at any rate, they're not sex neutral at all. They rather refer quite clearly to LGBTQ people."

changing the employee's sex would have yielded a different choice by the employer—a statutory

violation has occurred."). Take the Supreme Court's example about an office holiday party:

> Imagine an employer who has a policy of firing any employee known to be
> homosexual. The employer hosts an office holiday party and invites employees to
> bring their spouses. A model employee arrives and introduces a manager to Susan,
> the employee's wife. Will that employee be fired? If the policy works as the
> employer intends, the answer depends entirely on whether the model employee is a
> man or a woman. To be sure, that employer's ultimate goal might be to discriminate
> on the basis of sexual orientation. But to achieve that purpose the employer must,
> along the way, intentionally treat an employee *worse* based in part on that
> individual's sex.

*Id.* at 1742 (emphasis added). In this hypothetical, the Supreme Court kept "all things the same"

except for the employee's biological sex, then concluded that if a man would not be fired for being

married to a woman, then a woman cannot be fired for being married to a woman. *Id.* Since the

hypothetical was focused on one of the issues before the Supreme Court, an employer who has a

policy of firing *any* employee known to be homosexual, the simple but-for "favoritism" test,

changing only the biological sex of the employee, yielded liability for the employer.

However, an employer does not violate Title VII when the secondary trait considered

would be equally intolerable in a man or a woman, and that trait is not inherently related to sex.

*See Bostock*, 140 S. Ct. at 1740. ("Take an employer who fires a female employee for tardiness or

incompetence or simply supporting the wrong sports team. Assuming the employer would not have

tolerated the same trait in a man, Title VII stands silent."). *But see id.* at 1741–42 ("Consider an

employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that

rule because an employee is a woman *and* a fan of the Yankees is a firing 'because of sex' if the

employer would have tolerated the same allegiance in a male employee.").

The blindness test is most explicitly implicated when the Supreme Court held that an employer violates Title VII if they are willing to fire "males *and* females who are homosexual or transgender."

> An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender. Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII. So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

*Id.* at 1742–43. Although an employer that would fire both males and females who are homosexual or transgender satisfies the favoritism test, because neither biological sex would be treated worse than the other, the employer is not blind to sex when deciding to fire an individual due to homosexual or transgender identity.

Whether the blindness test as articulated in *Bostock* applies depends on whether the secondary trait is necessarily related to sex:

> Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

> Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id.* at 1741–42. So, if the secondary trait at issue is homosexual or transgender identity, then the employer must satisfy both the favoritism and the blindness test. And since homosexual and transgender identity are "inextricably bound up with sex," discrimination on those grounds fails the tests. *Id.* at 1740.

### d.  Plaintiffs' Codes of Conduct

Plaintiffs seek a declaration that their workplace policies and codes of conduct do not violate Title VII. Specifically, Plaintiffs argue that, despite *Bostock*, they are permitted to discriminate against bisexual[34] conduct, transgender conduct (such as cross-dressing, using pronouns inconsistent with biological sex, and hormone treatments), and other policies that regulate conduct evenly among males and females. Pls.' Summ. J. Br. 20–21, ECF No. 90. Defendants argue that a policy that applies evenhandedly to males and females may still violate Title VII if it discriminates against homosexual and transgender individuals. Defs.' Summ. J. Br. 32, ECF No. 96.

Defendants read *Bostock* as a broad pronouncement that discrimination against homosexual or transgender conduct is always sex discrimination, notwithstanding the Supreme Court's explicit reservation of judgment[35] on other types of policies, like dress codes and separate bathrooms based on biological sex. Plaintiffs argue their policies are compatible with *Bostock*.

---

[34] Bisexuality is characterized by sexual or romantic attraction to people of both sexes. *See* Bisexual, Oxford English Dictionary, https://www.oed.com/viewdictionaryentry/Entry/19448 (updated June 2020).

[35] *See Bostock*, 140 S. Ct. at 1753 ("The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind.").

Under *Bostock*, an employer violates Title VII if it treats an employee worse because of biological sex, and that an employer similarly violates Title VII if it targets solely[36] homosexual or transgender conduct with its policies. It follows, then, that the "blindness" test is activated only if the secondary trait or conduct considered by the employer is "inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1740.

### i.     Policies Against Bisexual Conduct

Plaintiffs argue that employers are permitted to discriminate against bisexuals because *Bostock* only addresses homosexuality and transgenderism. Defendants argue that whether *Bostock* protects bisexuals from discrimination is a settled question, because the Sixth Circuit held that bisexual orientation is now protected. *See* Takemoto, Transcript 47, ECF No. 109 ("So there was a claim of discrimination against a bisexual employee and the employer argued that Title VII does not extend to bisexual employees. And the Sixth Circuit said, no, following the reasoning of *Bostock*, it does extend to bisexual employees." (emphasis added)). At best, this is a hasty reading of the Sixth Circuit's order. Defendants' representation is based on the Sixth Circuit's remand order which simply instructed the district court to reconsider its Rule 12(b)(6) dismissal in light of *Bostock*. *See* Order, *Breiner v. Bd. of Educ. of Montgomery Cty.*, No. 19-5123 (6th Cir. Oct. 20, 2020), ECF No. 34.

Following *Bostock,* an employer violates Title VII if it treats an employee worse because of biological sex, and that an employer similarly violates Title VII if it targets solely homosexual or transgender conduct with its policies. *Bostock*, 140 S. Ct. at 1740 (holding that an employer violates Title VII even if it would fire both men and women for "being homosexual or

---

[36] "The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Bostock*, 140 S. Ct. at 1753.

transgender"). If the secondary trait or conduct considered by the employer is unique to sex, the blindness test is triggered.

A policy against bisexual conduct does not favor one biological sex over the other. Put more bluntly, a male can be bisexual, and a female can be bisexual, so an employer does not favor one biological sex over the other by discriminating against bisexuals. The traditional but-for "favoritism" analyses would stop here, and Plaintiffs would easily prevail. The analysis in *Bostock* did not stop here, though, because an "employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender." *Bostock*, 140 S. Ct. at 1742–43.

Therefore, the Court must also determine, under *Bostock*, whether a policy against bisexual conduct targets homosexual or transgender individuals or is not "blind" to sex. Either one whose biological sex and gender identity is the same or a transgender individual could be bisexual, but it is not true that *either* a homosexual or a heterosexual individual could be bisexual. An individual who is bisexual inherently identifies as homosexual to some extent, even if they also identify as heterosexual, because bisexuality is some combination of the two orientations. *See supra* n.34. Therefore, the Court concludes that a policy that prohibits *only* bisexual conduct also inherently targets sex and therefore violates Title VII. Accordingly, Plaintiffs' Motion for Summary Judgment on this ground is **DENIED** and Defendants' Motion for Summary Judgment on this ground is **GRANTED.**

### ii.     Policies Prohibiting Certain Sexual Activities

Plaintiffs seek a declaration that both Religious Business-Type Employers and All Opposing Employers are permitted to regulate the sexual conduct of their employees—specifically, whether a religious corporation like Braidwood is permitted to require employees to

abide by Biblical standards of sexual conduct, or whether a nonreligious employer may fire an employee who engages in some form of sexual conduct prohibited by its policies. The Court holds that the Religious Business-Type Employer Class and All Opposing Employer Class are permitted to create and maintain codes of conduct that regulate the sexual conduct of their employees, to the extent that those policies do not target solely homosexual or transgender activities.

For example, Plaintiffs contend their policies—which require their employees to refrain from certain sexual activities, including sodomy, premarital sex, adultery, and any other kind of sexual activity that occurs outside the context of a marriage between a man and a woman—are permitted. Because these prohibitions do not apply exclusively to bar homosexual conduct, the Court finds that so long as the prohibitions apply evenly to men and women, the employer does not favor one biological sex over the other, and therefore does not violate Title VII.

*Bostock* does not protect sexual conduct; it protects employees from being treated differently based on their biological sex, which is an immutable characteristic distinct from sexual conduct itself. *See Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021) (holding that *Bostock* does not necessarily extend to "sexual activity") ("Ordinary speakers of English would say an individual possesses 'sex' as a characteristic and that multiple 'individuals' can 'have sex.' But no one would use 'such individual's ... sex' to refer to sexual activity between persons without converting sex into an adjective and appending a noun ('sex*ual* activity') or creating a compound noun ('sex *act*')."). Policies that enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity do not discriminate "because of" sex. Therefore, Plaintiff's Motion for Summary Judgment on this ground is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED.**

### iii.    Dress Code Policies

Plaintiffs seek a declaration that the classes are permitted to enforce dress code policies. Pls.' Summ. J. Br. 20–21, ECF No. 90. Defendants argue that an employer may not prohibit an employee from dressing or "presenting" in accordance with their professed gender identity, because to do so would be sex discrimination.[37] Defs.' Summ. J. Br. 31–32, ECF No. 96. The All Opposing Employers Class maintains that they must be able to enforce a dress code to uphold professionalism in the workplace, while Braidwood and the Religious Business-Type Employer Class asserts that it must be able to enforce a dress code in accordance with its religious beliefs about biological sex. Hotze Decl. ¶ 13, ECF No. 90-5. Although the motivations for the dress codes are different, each class seeks a declaration that Title VII permits them to enforce sex-specific dress codes.

Braidwood enforces a sex-specific dress-and-grooming code that requires men and women to wear professional attire according to their biological sex. *See* Hotze Decl. 8-11, ECF No. 90-5. Hotze states that he enforces this sex-specific dress-and-grooming code not only to maintain the professionalism of his businesses, but also to express his belief that the Bible requires men to dress as men and requires women to dress as women. *Id.* Defendants argue that an employer must allow an employee to dress in accordance with the employee's professed gender identity. Defs.' Summ. J. Br. 32, ECF No. 96; *see also Price Waterhouse*, 490 U.S. at 239 (holding that sex stereotyping may be evidence of sex discrimination under Title VII).

Under Braidwood's sex-specific dress code, both men and women must abide by equally professional, but distinct, standards. *See* Hotze Decl. 8-11, ECF No. 90-5. Men are forbidden to

---

[37] *See* Protections Against Employment Discrimination Based on Sexual Orientation or Gender, EEOC, https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender (last accessed September 3, 2021).

wear earrings, but women may. Men who have customer contact must wear a tie; women are not permitted to wear ties. *Id.* Women can wear skirts, blouses, shoes with heels, and fingernail polish, while men are forbidden to wear any of these items. *Id.* These rules apply evenly to those who identify with their biological sex and to transgender individuals. Since the policy requires men to wear slacks, a male employee who wears jeans and a male-to-female transgender employee who wears dresses are equally in violation of the rule. *See* Am. Compl. Ex. 4, ECF No. 86-4. Because the dress code is enforced evenhandedly, unlike its policy regarding hormone treatment which targets transgender individuals, Braidwood's dress code policy does not violate Title VII.

Even so, Defendants argue that transgender individuals deserve special protection under *Bostock*. On one hand, Defendants assert that an employer should be completely blind to sex, and on the other, they assert that employers should give special preference to individuals who identify as the opposite sex. Defendants cannot have it both ways. Transgender individuals are not a protected class, and the "discrimination" must still link to a biological sex. *Bostock*, 140 S. Ct. at 1740. A biological male who wishes to dress as a female would be placed in the same position as a biological female who wishes to dress as a male. In the same way, a biological man who wishes to pierce his ears would be in the same position as a biological female who wishes to wear a tie.

Moreover, *Bostock* explicitly reserved judgment on the constitutionality of dress codes. *Id.* at 1753 ("[U]nder Title VII itself, [the employers] say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.").

Therefore, the Court determines that Title VII does not prohibit sex-specific dress codes. Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED**.

### iv.    Policies Prohibiting Hormone Treatments and Genital Surgery

Plaintiffs seek a declaration that they can prohibit (1) genital modification surgery and (2) the use of hormone treatments, unless required for a medical condition other than gender dysphoria. Am. Compl. 17, ECF No. 86. The employers' prohibition of surgery and hormone treatment would apply only to individuals with gender dysphoria, so on their face, the policies explicitly target transgender individuals. Although men and women would be treated evenly under this policy, the reasoning in *Bostock* extended Title VII protection to both men and women who are transgender. Therefore, since these policies would *only* function to discriminate against individuals with gender dysphoria, the Court holds that such policies violate Title VII. Therefore, Plaintiffs' Motion for Summary Judgment on this ground is **DENIED** and Defendants' Motion for Summary Judgment on this ground is **GRANTED**.

### v.    Sex-Specific Restrooms

Plaintiffs seek a declaration that they may prohibit employees from using a restroom designated for the opposite biological sex. Am. Compl. 13–15, ECF No. 86. Defendants maintain that if an individual identifies as the opposite sex, the employer must accommodate. *See Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015). Again, *Bostock* does not address this issue, but Defendants read the Supreme Court's reasoning as empowering it to act as though the distinctions between the two biological sexes no longer exist.

If anything, *Bostock* reinforces the distinction between biological sexes and held that treating one sex worse than the other constitutes sex discrimination. The Supreme Court has long

recognized the need for privacy in close quarters, bathrooms, and locker rooms to protect individuals with anatomical differences—differences based on biological sex. *See United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (observing that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."). Like sex-specific dress codes, sex-specific bathrooms do not treat one sex worse than the other. The Court finds that employers may have policies that promote privacy, such as requiring the use of separate bathrooms on the basis of biological sex. Accordingly, Plaintiffs' Motion for Summary Judgment on this ground must be **GRANTED** and Defendants' Motion for Summary Judgment must be **DENIED.**

## IV. CONCLUSION

For the reasons stated, the Court finds that Plaintiffs' Motion to Certify (ECF No. 71) must be **GRANTED in part and DENIED in part**, Plaintiffs' Motion for Summary Judgment (ECF No. 72) must be **GRANTED in part and DENIED in part**, and Defendants' Motion for Summary Judgment (ECF No. 95) must be **GRANTED in part and DENIED in part**.

**SO ORDERED** on this **31st day** of **October, 2021.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**